[24 NYS3d 18]

In the Matter of FOSTER WILLIAMS, Appellant, v DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, Respondent.

First Department, January 12, 2016

## APPEARANCES OF COUNSEL

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Lauren Stephens-Davidowitz* of counsel), for appellant.

*Eric T. Schneiderman, Attorney General*, New York City (*Karen W. Lin* and *Steven C. Wu* of counsel), for respondent.

## OPINION OF THE COURT

GISCHE, J.

In this appeal we are asked to consider whether the mandatory 1,000-foot buffer zone, contained in New York's Sexual Assault Reform Act (Executive Law § 259-c [14]) (SARA), which prohibits sex offender parolees from residing or traveling near schools or other institutions where minor children congregate, violates the Ex Post Facto Clause of the United States Constitution, and substantive due process rights under the United States and New York State Constitutions. These are issues of first impression in our Court.[1] For the reasons that follow, we hold that under the highly deferential constitutional standard applicable to legislative enactments, SARA does not violate either the Federal or the New York State Constitutions. Because SARA meets the tests of constitutionality, issues regarding whether there are better or wiser ways to achieve the law's stated objectives are policy decisions belonging to the legislature and not the courts (*People v Parilla*, 109 AD3d 20, 29 [1st Dept 2013], *lv denied* 21 NY3d 865 [2013]).

On November 21, 1995, petitioner was convicted of rape in the first degree, three counts of sodomy in the first degree, and endangering the welfare of a child. His conviction was affirmed on appeal (*People v Williams*, 257 AD2d 425, 425 [1st Dept 1999], *lv denied* 93 NY2d 930 [1999]). The victim of the crimes was a nine-year-old girl. Petitioner was sentenced to a prison term of 7 to 21 years (*see id.*). On December 20, 2012, when petitioner was 64 years old, he was released to parole supervision. He is due to complete his sentence on November 18, 2016.

In accordance with SARA, the granting of petitioner's parole was subject to mandatory conditions that restrict both the location of his residency and his knowing travel to no closer than 1,000 feet of school grounds. Petitioner claims that the residency restriction has made it impossible to find housing within the borough of Manhattan and nearly impossible to find

---

1. In addition to this case, the issue has been considered by two other trial courts and one federal district court, all reaching different conclusions about the constitutionality of New York's statute (*see Wallace v New York*, 40 F Supp 3d 278 [ED NY 2014] [finding that SARA does not violate the Ex Post Facto Clause]; *Devine v Annucci*, 45 Misc 3d 1001, 1009 [Sup Ct, Kings County 2014] [finding SARA violated the Ex Post Facto Clause "as applied" to petitioner]; *Matter of Berlin v Evans*, 31 Misc 3d 919, 928 [Sup Ct, NY County 2011] [finding that the 2005 amendments violated the Ex Post Facto Clause because the law was intended to increase punishment against convicted sex offenders and was "clearly punitive in effect"], *appeal dismissed* 103 AD3d 405 [1st Dept 2013]).

housing elsewhere within the city. At the time the petition was filed, petitioner was residing in the men's homeless shelter at Bellevue, which is located within a zone that is otherwise prohibited under SARA.[2] Petitioner also claims that he is unable to reasonably travel within Manhattan and that even required visits to his parole officer, and travel to drug and sex offender treatment programs, are made in violation of SARA's restriction on travel. He maintains that the restrictions impede his ability to visit doctors, lawyers, social workers, friends and family.[3] The record contains a demonstrative depiction, entitled "Manhattan No-go Zones and Public Bus Network," showing that most of Manhattan is off-limits to petitioner. Although the map truncates portions of the Bronx and Queens, it shows "no-go" or buffer zones in those boroughs as well. There is no depiction of Brooklyn, Staten Island or any other part of New York State.

Petitioner filed a hybrid declaratory judgment/CPLR article 78 petition claiming that SARA violates the Ex Post Facto Clause of the United States Constitution and his substantive due process rights under both the Federal and New York State Constitutions. Respondent filed an answer asserting that SARA is constitutional on its face and denying most of petitioner's factual allegations about SARA's effect on him. The motion court held that SARA is constitutional (43 Misc 3d 356 [2014]).

SARA was first passed in 2000, only after petitioner was convicted. As originally enacted, it barred sex offenders whose victims were minors from knowingly entering school grounds or a facility or institution that primarily cares for minors. The restriction only applied to sex offenders convicted of certain enumerated offenses and only if the victim had been under the age of 18. It only applied while sex offenders were on parole and still under the custody and supervision of respondent Department of Corrections and Community Supervision

---

**2.** Petitioner states in his brief that he has since moved to a shelter on Wards Island. Although respondent Department of Corrections and Community Supervision had formerly placed parolees subject to SARA at the Bellevue shelter, it later changed its policy, concluding that the shelter was within a prohibited buffer zone and could not serve as a SARA-compliant residence (*see People ex rel. Johnson v Superintendent, Fishkill Corr. Facility*, 47 Misc 3d 984 [Sup Ct, Dutchess County 2015]).

**3.** A further, albeit discretionary, condition of his parole prevents petitioner from leaving the City of New York without permission of his parole officer. Clearly this additional condition compounds petitioner's ability to remain SARA compliant.

(DOCCS) (L 2000, ch 1, § 8). While the bar on entering school grounds applied at all times of day and night, the bar on entering a facility or institution only applied when minors were present. The law required that the bar be made a mandatory condition of parole. A violation of SARA was a violation of parole. No separate sanction, criminal or otherwise, was specified for a violation (Executive Law § 259-c [14]). There were limited exceptions to SARA's application if the parolee was a student or employee working at the school or institution or had a family member enrolled there.[4]

Effective September 2005, SARA was amended in two respects. First, the definition of "school grounds" was broadened to include publically accessible areas within 1,000 feet of school property (L 2005, ch 544, § 2). In expanding the geographical definition of "school grounds," SARA incorporated a definition already contained in Penal Law § 220.00. Second, SARA's coverage was extended to include sex offenders who are classified as high risk, level three sex offenders under the Sex Offender Registration Act (SORA). Level three sex offenders are subject to the ban regardless of whether any of their victims were minors. Although the statute itself does not restrict the location of a residence per se, the expanded definition of "school grounds" necessarily operates to restrict places where a parolee may live and travel (*People v Diack*, 24 NY3d 674, 681-682 [2015]). The law was otherwise unchanged.[5]

---

4. These exceptions still require written authorization of the parole officer and the head of the institution (*id.*)

5. Executive Law § 259-c (14) provides as follows:

"notwithstanding any other provision of law to the contrary, where a person serving a sentence for an offense defined in article one hundred thirty, one hundred thirty-five or two hundred sixty-three of the penal law or section 255.25, 255.26 or 255.27 of the penal law and the victim of such offense was under the age of eighteen at the time of such offense or such person has been designated a level three sex offender pursuant to subdivision six of section one hundred sixty-eight-l of the correction law, is released on parole or conditionally released pursuant to subdivision one or two of this section, the board shall require, as a mandatory condition of such release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds, as that term is defined in subdivision fourteen of section 220.00 of the penal law, or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present, provided however, that when such sentenced offender is a registered student or participant or

Petitioner was adjudicated a level two sex offender under SORA. SARA applies to him only by virtue of the fact that he was convicted of at least one of the statutorily enumerated sex offenses[6] and that his victim was under the age of 18.

## The Ex Post Facto Clause

"The Ex Post Facto Clause of the United States Constitution [art I, § 10] prohibits states from enacting laws that criminalize prior, then-innocent conduct; increase the punishments for past offenses; or eliminate defenses to charges for incidents that preceded the enactment" (*Kellogg v Travis*, 100 NY2d 407, 410 [2003]). "The prohibition on ex post facto laws applies only to penal statutes[,]" so that where the challenged conduct does not seek to impose a punishment, there is no constitutional violation (*id.*).

The threshold question for the Court is whether the challenged law is retrospective—that is, does it apply to events occurring before its enactment and does it disadvantage the offender affected by it (*Weaver v Graham*, 450 US 24, 29 [1981]).

---

an employee of such facility or institution or entity contracting therewith or has a family member enrolled in such facility or institution, such sentenced offender may, with the written authorization of his or her parole officer and the superintendent or chief administrator of such facility, institution or grounds, enter such facility, institution or upon such grounds for the limited purposes authorized by the parole officer and superintendent or chief officer. Nothing in this subdivision shall be construed as restricting any lawful condition of supervision that may be imposed on such sentenced offender."

Penal Law § 220.00 defines school grounds as follows:

"14. 'School grounds' means (a) in or on or within any building, structure, athletic playing field, playground or land contained within the real property boundary line of a public or private elementary, parochial, intermediate, junior high, vocational, or high school, or (b) any area accessible to the public located within one thousand feet of the real property boundary line comprising any such school or any parked automobile or other parked vehicle located within one thousand feet of the real property boundary line comprising any such school. For the purposes of this section an 'area accessible to the public' shall mean sidewalks, streets, parking lots, parks, playgrounds, stores and restaurants."

6. The conviction for rape in the first degree, pursuant to Penal Law § 130.35, is a qualifying conviction under SARA (*see* Executive Law § 259-c [14]). After his convictions, the crimes of sodomy were renamed under Penal Law § 130.40 et seq. as criminal sexual acts. These are qualifying convictions under SARA.

There is no dispute that SARA is retrospective. It was both passed and amended only after petitioner was originally convicted and it has been applied to impose mandatory restrictions on him during his period of parole.

Since the challenged enactment is retrospective, in order to determine whether it violates the Ex Post Facto Clause, we apply the intent-effects analysis established by the United States Supreme Court, as articulated in *Smith v Doe* (538 US 84, 92 [2003]; *see also People v Parilla*, 109 AD3d 20, 23 [1st Dept 2013], *lv denied* 21 NY3d 865 [2013]). We first ascertain whether the legislature intended the statute to impose punishment or to enact a civil regulatory scheme that is nonpunitive (*id.*). If the legislature intended to impose punishment, then retroactive application of the law violates the Ex Post Facto Clause, ending the Court's inquiry (*id.*). If, however, the legislature intended to establish civil proceedings, then the Court must go on to examine whether the statutory scheme is so punitive, either in its purpose or effect, that the State's intention to deem it civil is negated (*Smith v Doe* at 92). Resolution of these questions is a matter of statutory interpretation (*Kansas v Hendricks*, 521 US 346, 361 [1997]; *United States v One Assortment of 89 Firearms*, 465 US 354, 362 [1984]).

Punitive Intent

█ We conclude that both SARA, as originally enacted, and the 2005 amendments, were intended to be civil measures designed to protect the public. More particularly, SARA was enacted to protect children from victimization by sexual predators by limiting access that certain previously adjudicated sex offenders could have to defined public areas where children regularly congregate and travel. This intent is evident from both the text of the law and the legislative history, and it is consistent with other civil regulatory schemes, designed to protect the public, which have been enacted in New York State and concern the management of sex offenders.

The complete focus of the geographical restrictions contained in the text of the statute itself correlates entirely with areas where children are regularly expected to be in larger numbers. The restrictions on institutions other than schools are limited to times only when children are actually there. The limitation does not apply to all sex offenders, but rather only to those who in the legislature's evaluation have a greater likelihood of reoffending against child victims. The child-focused language

in the statute itself strongly supports the legislative intent to protect children as opposed to further punishing sex offenders.

To the extent legislative history exists for SARA, both at the time it was originally enacted and when amended in 2005, it supports a conclusion that it was enacted with the goal of protecting children and not to further punish sex offenders for their prior bad acts. The sponsor's memorandum in the Assembly describes the justification of the 2005 bill as "a need to prohibit those sex offenders who are determined to pose the most risk to children from entering upon school grounds or other areas where children are cared for" (Sponsor's Mem, Bill Jacket, L 2005, ch 544 at 4). Assemblyman Harvey Weisenberg, as sponsor of the bill, wrote to the Governor's counsel in support of the bill: "Given the threat to our children posed by sex offenders and the terrible damage caused by their heinous acts, we must strive to protect the youngest and most vulnerable members of our society from such horrible crimes in any way we can" (*id.* at 3). The State Education Department wrote a letter in support of the bill "because it will provide greater protection to children" (Letter from St Educ Dept, July 8, 2005, Bill Jacket, L 2005, ch 544 at 6). When SARA was originally passed in 2000, the Attorney General's Office supported the legislation, explaining in a supporting memorandum that the purpose of the bill was "to protect children from sexual predators" (Mem of NY Attorney General, Aug. 22, 2000, Bill Jacket, L 2000, ch 1 at 5).

SARA's civil legislative intent, which is to protect the public, is consistent with other existing New York legislation designed to manage other aspects of future behavior by adjudicated sex offenders. SORA requires all sex offenders to register with the State and provides for notification to the community (Correction Law § 168 *et seq*). The Sex Offender Management and Treatment Act (SOMTA), which only applies after the completion of a criminal sentence, provides for civil supervision and potential confinement of sex offenders who suffer from a mental abnormality (Mental Hygiene Law § 10.01 *et seq*). These statutes have each been found to be civil regulatory schemes, intended to protect the public from the risk of recidivism by sex offenders (*Doe v Cuomo*, 755 F3d 105, 110-112 [2d Cir 2014] [SORA amendments found nonpunitive]; *Doe v Pataki*, 120 F3d 1263, 1276 [2d Cir 1997] ["There is ample evidence that the New York legislature intended the SORA to further nonpunitive goals"], *cert denied* 522 US 1122 [1998]; *Parilla* at 23

[rather than imposing punishment for a past crime, SORA is a remedial statute intended to prevent future crime]; *Matter of North v Board of Examiners of Sex Offenders of State of N.Y.*, 8 NY3d 745, 752 [2007] [same]; *People v Harnett*, 16 NY3d 200, 206 [2011] [SOMTA, like SORA, is not a penal statute designed to punish a past crime, but a remedial one designed to prevent a future crime]; *Matter of State of New York v Nelson*, 89 AD3d 441, 442 [1st Dept 2011] [proceedings under SOMTA are non-punitive civil proceedings to which the Ex Post Facto Clause is inapplicable]). SARA, like SORA and SOMTA, is yet another remedial statute enacted by the legislature that is designed to protect the public, specifically children, from future crime. SARA shares a similar civil regulatory purpose to its legislative counterparts.[7]

We reject petitioner's argument that because SARA incorporates the definition of school grounds contained in Penal Law § 220.00 (14), we must conclude that the legislature intended SARA to be punitive. The reference to school grounds as defined in the Penal Law is not, in itself, sufficient to show criminal intent, in view of other more relevant evidence to the contrary, as previously discussed. "The location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one" (*Smith v Doe* at 94 [Alaska SORA upheld as a

---

7. In a recent case finding that the SARA preempts local laws on issues relating to the management of sex offenders, the Court of Appeals considered the legislature's collective intent in enacting SORA, SARA and SOMTA (*Diack*, 24 NY3d 674).

Numerous states have enacted laws restricting the residency of convicted sex offenders. Although each state law is unique in its restrictions and application, and the courts have reached different conclusions on the constitutionality of the particular residency restriction before them, the courts have been almost uniform in finding that the particular residency restrictions were not enacted with any punitive intent (*see e.g. McGuire v Strange*, 83 F Supp 3d 1231, 1247 [MD Ala 2015] [Alabama statute]; *Commonwealth v Baker*, 295 SW3d 437, 443 [Ky Sup Ct 2009], *cert denied* 559 US 992 [2010]; *Weems v Little Rock Police Dept.*, 453 F3d 1010, 1017 [8th Cir 2006] [Arkansas statute], *cert denied* 550 US 917 [2007]; *Doe v Miller*, 405 F3d 700, 718 [8th Cir 2005] [Iowa statute], *cert denied* 546 US 1034 [2005]; *Starkey v Oklahoma Dept. of Corr.*, 305 P3d 1004, 1020 [Okla Sup Ct 2013]; *State v Trosclair*, 89 So3d 340, 350 [La Sup Ct 2012]; *People v Mosley*, 60 Cal 4th 1044, 1065, 344 P3d 788, 801-802 [Sup Ct 2015]; *but see State v Williams*, 129 Ohio St 3d 344, 348, 952 NE2d 1108, 1112 [Sup Ct 2009]). Even when courts have found that individual state laws violate the Constitution, they have concluded that the laws were not enacted with a punitive intent (*see Commonwealth v Baker*, 295 SW3d at 443; *Starkey v Oklahoma Dept. of Corr.*, 305 P3d at 1020).

civil, nonpunitive measure even though the Act's registration provisions were codified in Alaska's criminal procedure code]).

We also reject the argument that because SARA's mandatory conditions only apply to parolees, it necessarily is intended to punish them. SARA imposes no restrictions, punishment, or penalty over and above that to which parolees are already subject. For instance, there are no separate criminal or additional penalties imposed for violating SARA (*cf. Commonwealth v Baker* at 443, 447 [residency restriction that punished first offense as a class A misdemeanor and any subsequent offense as a class D felony violated Ex Post Facto Clause as applied]; *Weems v Little Rock Police Dept.* at 1014, 1017 [upholding constitutionality of Arkansas residency restriction that punished offense as a class D felony]; *Doe v Miller* at 705, 723 [upholding constitutionality of Iowa residency restriction that made offense an aggravated misdemeanor]). The "penalties" imposed for violating SARA are the same penalties that apply for any other parole violations. While SARA's objective to deter future crime is consistent with DOCCS's statutory mandate that parole can only be granted if an inmate can live and remain at liberty without violating the law (Executive Law § 259-i [2] [c] [A]), the coalescence of these objectives does not transform a civil intent into a punitive one (*Smith v Doe* at 102).

Punitive Effect

Because we conclude that SARA was not enacted with a punitive intent, we now consider whether the statutory scheme is otherwise so punitive in purpose or effect as to negate the State's intention to deem it civil (*Smith v Doe* at 92). Statutes that are enacted as civil regulatory schemes can only be challenged as facial violations of ex post facto laws (*Seling v Young*, 531 US 250, 263 [2001]). In deciding whether such a statute imports a punitive purpose or effect, courts are guided by consideration of certain factors articulated by the United States Supreme Court (*Smith v Doe* at 97; *Kennedy v Mendoza-Martinez*, 372 US 144 [1963]). The factors most relevant to our analysis are whether the sanction imposes an affirmative disability or restraint, has been historically regarded as a punishment, promotes traditional aims of punishment, has a rational connection to a nonpunitive purpose or is excessive with respect to its nonpunitive purpose (*id.*). In the end, "only the clearest

proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty" (*Smith v Doe* at 92 [internal quotation marks omitted]). "[A] statutory scheme that serves a regulatory purpose is not punishment even though it may bear harshly on [those] affected" (*Doe v Pataki*, 120 F3d at 1279 [internal quotation marks omitted]).

As more fully set forth below, while some factors favor petitioner, overall we do not find the clear proof that is necessary to support a determination that SARA is punitive in its effect. The legislature was not "masking punitive provisions behind the veneer of a civil statute" (*Matter of State of New York v Nelson*, 89 AD3d 441, 442 [1st Dept 2011]). Consequently, we conclude that SARA does not violate the Ex Post Facto Clause of the United States Constitution.

## Affirmative Restraint/Historically Criminal Punishment/ Promotes Deterrence

We agree with petitioner that the residency and travel restrictions SARA imposes constitute affirmative restraints, bear some resemblance to historical criminal punishment, and serve the goal of deterrence. Because, however, SARA only applies to parolees, who otherwise have restricted liberty, these factors do not strongly support a conclusion that SARA is punitive in effect (*see Morrissey v Brewer*, 408 US 471, 482 [1972] [recognizing that even though a parolee has a liberty interest that requires some measure of due process when parole is revoked, the State may "properly subject( ) (a parolee) to many restrictions not applicable to other citizens"]; *Matter of Williams v New York State Div. of Parole*, 71 AD3d 524, 525 [1st Dept 2010] [state has discretion to place restrictions on parole release because inmates have no constitutional right to be released to parole supervision before serving a full sentence], *appeal dismissed* 15 NY3d 770 [2010], *lv denied* 15 NY3d 710 [2010]).

There is no question that SARA on its face imposes affirmative restraints on petitioner, as well as anyone else to which it applies. While the parties may factually disagree about the extent of the restrictions and the burdens actually imposed, SARA by its terms restricts the parolee's freedom of movement and choice of residency. The restraints are neither minor nor indirect, especially when applied to parolees released to live in densely populated areas, where there are many schools or other

institutions caring for children (*see Smith v Doe* at 100).[8,9] Similarly, to the extent that any affirmative geographic restraint for any period of time is akin to "banishment," SARA's restrictions share that label. Banishment has been broadly construed to mean compelling an individual to quit a city, place, or country for a specified period of time (*United States v Ju Toy*, 198 US 253 [1905]). Banishment has, both in antiquity and modern jurisprudence, been viewed as a form of criminal punishment (*Kennedy v Mendoza-Martinez* at 168 n 23; *see also Stewart v Commonwealth of Kentucky*, 2011 WL 3962606, 2011 Ky App Unpub LEXIS 666 [Sept. 9, 2011, No. 2010-CA-000838-MR]). While SARA's geographic limitations resemble "banishment," that label does little by way of proving a punitive effect without reference to the actual restraints.

Because the actual restraints SARA places on parolees are no greater than the restrictions or conditions to which they are otherwise subject, they do not transform SARA's civil regulatory scheme into criminal punishment. Inmates have no federal or state constitutional rights to be released to parole supervision before serving a full sentence (*Matter of Williams v New York State Div. of Parole* at 525; *Matter of M.G. v Travis*, 236

---

**8.** In reaching this conclusion the Court does not look to the individualized circumstances of hardship presented by petitioner. Petitioner, himself, acknowledges that there can be no as-applied challenge based on the Ex Post Facto Clause (*see Seling v Young* at 263). In this regard, constitutional analysis of this statute, of statewide application, should not be limited in terms of how it affects parolees, like petitioner, with a particularized need to reside in Manhattan. The restrictions and burdens need to be evaluated more generally. It is for this reason that the Court does not need to resolve the parties' dispute about whether this parolee has an actual need or only a preference for residing in Manhattan in order to evaluate whether SARA imposes any affirmative restraint.

**9.** In viewing the claimed consequences of SARA on this particular petitioner, however, the Court observes that some of the hardships identified by him are a consequence of other, nonmandatory conditions of parole imposed by DOCCS or the failure by the State to provide necessary resources for a parolee to comply with SARA. For instance, in petitioner's case, DOCCS has imposed a discretionary restriction against petitioner leaving New York City. He is necessarily required as a condition of parole to report to his parole officer, yet the officer assigned to him is not in a SARA accessible location. Neither are any of the treatment programs that he is expected to attend. It is difficult to understand why a parole officer or treatment programs cannot be located in geographic locations consistent with SARA compliance. A parolee should not be required to make a Hobson's choice of complying with SARA or complying with other conditions of parole, while risking a violation of parole in either event. These questions, however, do not affect the core question of constitutionality raised in this proceeding.

AD2d 163, 167 [1st Dept 1997], *lv denied* 91 NY2d 814 [1998]).[10] Pursuant to Executive Law § 259-c (2) and 9 NYCRR 8003.3, special conditions may be imposed upon a parolee's right to release. The courts routinely uphold these conditions as long as they are rationally related to the inmate's past conduct and future chance of recidivism. Acceptable parole restrictions have included geographical restrictions and restrictions requiring that parolees refrain from contact with certain individuals or classes of individuals (*Matter of Boss v New York State Div. of Parole*, 89 AD3d 1265, 1266 [3d Dept 2011] [parole conditioned on finding an approved place of residence prior to release]; *Matter of Williams v New York State Div. of Parole* at 525 [parole condition prohibited contact with spouse absent permission]; *Matter of Poladian v Travis*, 8 AD3d 770, 770 [3d Dept 2004] [parole condition barred contact with an acquaintance]; *Matter of Dickman v Trietley*, 268 AD2d 914, 915 [3d Dept 2000] [parole condition restricted cohabitation with a woman with whom inmate began a relationship while incarcerated]; *Matter of Gerena v Rodriguez*, 192 AD2d 606, 607 [2d Dept 1993] [parole condition restricted employment as a chauffeur where vehicles were the means of past criminal acts]). Petitioner acknowledges that in the absence of SARA's mandatory condition to stay away from school grounds, DOCCS has imposed it as a discretionary condition of a sex offender's parole, albeit on a case-by-case basis (brief for petitioner at 8). The categorical application of the condition will be upheld as long as it is rationally related to SARA's objective (*see Williams* at 525), and the mandatory nature of the condition does not change this analysis.

In terms of whether SARA promotes traditional aims of punishment, we agree with petitioner that SARA is intended to promote deterrence. In fact, the primary objective of SARA is to prevent parolees from reoffending. While deterrence is a traditional objective of criminal punishment, it does not necessarily follow that a sanction aimed at deterring future crime compels a conclusion that it is a criminal penalty. As the United States Supreme Court observed in *Smith v Doe*, any number of programs might deter crime without imposing a punishment. "To hold that the mere presence of a deterrent purpose renders . . . sanctions criminal . . . would severely undermine the Government's ability to engage in effective regulation" (538 US

---

**10.** This is to be distinguished from the limited due process rights that attach to the revocation of parole (*Morrissey v Brewer*, 408 US 471 [1972]).

at 102 [internal quotation marks omitted]). In this circumstance, the deterrent objective of SARA does not aid in our analysis about whether the statute is punitive in effect.

We reject petitioner's argument that SARA promotes retribution. The restrictions imposed by SARA are consistent with the noncriminal objective of preventing future crime and do not subject a parolee to any additional sanctions or penalties other than those that could be validly linked to any other parole violation.

Rational Connection to a Nonpunitive Purpose/Excessiveness

These last factors concern the relationship and proportionality of the residency restrictions to their intended purpose. They are the most important tests in assessing whether SARA is punitive in effect (*Smith v Doe* at 102). The fit between the statute and its nonpunitive purpose need not be perfect, but must be a reasonable policy choice made to advance the stated objectives (*id.* at 103, 105). SARA is entitled to a presumption of constitutional validity and petitioner has the burden of demonstrating that SARA is not merely unwise or unfair, but that it serves no legitimate governmental purpose (*Ciafone v Kenyatta*, 27 AD3d 143, 146, 151-152 [2d Dept 2005]). Under this highly deferential standard, we conclude that there is a sufficient rational connection between SARA's nonpunitive intent and its effect. We also conclude that it is not unconstitutionally excessive.

SARA's legitimate governmental interest is the protection of children against people who have shown themselves capable of committing sex crimes. It operates on the basic premise that by limiting access to children, society can reduce the risk of re-offense. Petitioner argues that because there is no empirical data supporting a conclusion that SARA actually achieves its stated objective, SARA's effect is punitive. He further argues that because current research actually supports a conclusion that SARA does not achieve its stated nonpunitive purpose, there is no rational connection and it is excessive. While research data may provide a basis for showing a rational connection between an enactment and its nonpunitive objective, the lack of research data does not, by itself, warrant the opposite conclusion (*see Heller v Doe*, 509 US 312, 320 [1993] ["(A) legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data" (internal quotation marks omitted)]). One court considering the issue suggested that the con-

nection between deterrence and lack of access to victims is a matter of logic and common sense (*Doe v Miller*, 405 F3d at 716 [in finding that a residency restriction rationally advanced a legitimate state interest in reducing reoffenses, the court held that policymakers of Iowa are allowed to rely on "common sense"]). Other courts have found that a residency restriction designed to reduce the proximity between offenders and children is "within the range of rational policy options" (*e.g. Weems* 453 F3d at 1015; *Wallace*, 40 F Supp 3d at 278). The correlation between limiting access to potential victims and deterring crime is a proposition that is accepted in other aspects of our jurisprudence. It underlies SORA, in part, to the extent that notification permits the community to self-select association with sex offenders. It underlies parole conditions mandating that a parolee stay away from his or her victims. It also is a major underpinning for New York State laws concerning orders of protection (*see* Family Ct Act § 842; Domestic Relations Law § 252; CPL 530.12, 530.13; *People v Foster*, 87 AD3d 299, 307 [2d Dept 2011], *lv denied* 18 NY3d 858 [2011]). The correlation is no less rational or compelling when evaluating SARA.

In addition, contrary to the conclusion reached by the dissent, we believe that the rational connection between deterring recidivism and limiting access to potential victims supports SARA's ban both as to the real property boundaries of school buildings and the geographical buffer zones surrounding such buildings. Both the buildings and the buffer zones are areas where children are expected to travel and congregate in larger concentrations than other geographical locations (*see People v Robbins*, 5 NY3d 556 [2005]).

Petitioner calls to our attention important and considered research that questions the effectiveness of SARA and statutes like it. The data and information, however, is not conclusive and highlights why, at this time, decisions regarding how to deter future sexual crimes against children are policy matters for the legislature to address.

Data regarding the rates at which sex offenders reoffend and whether they reoffend at greater or lesser rates than nonsex offenders, or whether sex offenders who have victimized minors reoffend at higher rates, is conflicting (*see* Center for Sex Offender Management, Recidivism of Sex Offenders at 6-9 [May 2001]; United States Department of Justice, Bureau of Justice Statistics, Recidivism of Sex Offenders Released from Prison in 1994 at 1-2, 30-31 [Nov. 2003]). Based on existing literature,

the legislature could have reasonably concluded that statistics understate the problem of sex crimes against children (Recidivism of Sex Offenders Released from Prison in 1994 at 30; *see also People v Knox*, 12 NY3d 60, 68 [2009], *cert denied* 558 US 1011 [2009]). Some statistics support a legislative conclusion that the rate of reoffense for sexual offenders is substantial (*Smith v Doe* at 103). There is no disagreement, however, that some percentage of sex offenders do reoffend. Given the serious nature of sex offenses and their lifelong impact on victims, it is a policy decision to be made by the legislature about whether even a low reoffending rate is too high.

Data demonstrating that most sexual assaults against children are perpetrated by persons known to them does not warrant a conclusion that SARA cannot meet the rational connection test. The logical corollary embedded within that conclusion is that some sexual assaults against children are perpetrated by strangers. A legislature is not precluded from addressing one aspect of a problem and leaving other parts for another day. While residential and travel restrictions cannot eliminate all contacts between potential recidivists and the potential child victims, particularly where the perpetrator and victim are related, the residency restrictions are still a rational means of decreasing those contacts (*see Commonwealth v Baker*, 295 SW3d at 451 [Abramson, J., dissenting]).

For similar reasons, we also disagree with the dissent's conclusion that because SARA only applies to certain paroled sex offenders, without any analysis of the relative recidivism rates between them and those "released without parole," it lacks a rational relationship to its intended purpose. Even if the recidivism rate were the same between the two groups, partially addressing a problem does not negate a rational relationship. Moreover, persons released without parole are those who have fully served their sentences and are no longer under the supervision of DOCCS; thus, the liberty considerations are not the same.[11]

Petitioner points to research concluding that statutes like SARA have a destabilizing effect on housing for convicted sex offenders, impede treatment, and interfere with law enforce-

---

**11.** While in this decision we have broadly referred to SARA as applying to parolees, the express language of the statute also includes persons on postrelease supervision and those conditionally released. Consequently, the only group of people not subject to SARA who have been released without parole are those persons who have fully served their sentences.

ment efforts to supervise sex offenders (*see e.g.* Colorado Sex Offender Management Board, White Paper on the Use of Residence Restrictions as a Sex Offender Management Strategy [June 2009]; Jill S. Levenson & Andrea L. Hern, *Sex Offender Residence Restrictions: Unintended Consequences and Community Reentry*, 9 Just Res & Pol'y 59 [2007]). While these studies are compelling, they are not legally dispositive. The Court of Appeals has recently recognized that the management of sex offenders is an issue that has been comprehensively addressed by the State (*People v Diack*, 24 NY3d at 684). Decisions and evaluations about whether statutes are effective and whether there are better ways to protect the public from recidivism by sex offenders fall within the policy-making purview of the legislature (*People v Parilla*, 109 AD3d at 29).

Petitioner argues that the lack of individualized assessment of risk relative to the restrictions, renders the statute punitive. He claims that because the restrictions are mandatory, they can apply to parolees who present no risk of reoffending against children. This argument is best addressed in considering whether the effect of SARA is excessive. While an individualized assessment might conceivably result in a more nearly perfect fit consonant with the objectives of the statute, the categories of parolees to whom SARA applies is sufficiently narrowly drawn and reasonably related to an assessment of recidivism so as to pass constitutional muster. The Constitution "does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences" (*Smith v Doe* at 103; *see also People v Knox*, 12 NY3d 60 [2009] [upholding constitutionality of SORA requirement that all persons convicted of committing or attempting to commit kidnapping or unlawful imprisonment of children not their own register as sexual offenders despite lack of sexual act or motivation]). The determination of whether an individualized assessment is constitutionally required turns on the magnitude of the restraint imposed (*Smith v Doe* at 104). In *Smith v Doe* (538 US 84 [2003]), the United States Supreme Court determined that the use of categories of convicted felons subject to Alaska's registration requirements, without the need for individualized assessment, was constitutional (*id.* at 104). In *Kansas v Hendricks* (521 US 346 [1997]), although the Supreme Court upheld a state statute providing for the civil commitment of dangerous sex offenders after their release from prison, it did so in part because there

was an individualized assessment of the offender. In distinguishing its seemingly inconsistent treatment of the two regulatory schemes, the Court in *Smith v Doe* relied on the magnitude of the restraint, finding that the involuntary and potentially indefinite confinement considered in *Hendricks* made individual assessment appropriate (*Smith v Doe* at 104). The restraints imposed by SARA are somewhere in between sex offender registration (considered in *Smith v Doe*) and civil commitment (considered in *Kansas v Hendricks*) in terms of their magnitude. We find for constitutional purposes that SARA's restraints are not of a sufficient magnitude to require individualized assessments. This is because SARA only applies to parolees, who have only limited liberty. It lapses once the period of parole terminates. The categories are otherwise sufficiently limited to people, who in the legislature's evaluation, have an unacceptable risk of recidivism against children. Thus, SARA does not apply to all sex offenders on parole, but only those who have previously victimized minors or are level three sex offenders under SORA, which is the category most likely to reoffend among all sex offenders.

Right to Intrastate Travel/Substantive Due Process

Petitioner claims that SARA deprives him of his right to intrastate travel and otherwise deprives him of his liberty, in violation of the Due Process Clause of both the United States and New York Constitutions (US Const Amends V, XIV; NY Const, art I, § 6).

Even assuming there is a fundamental right to intrastate travel (*see Memorial Hospital v Maricopa County*, 415 US 250, 255-256 [1974] [reserving the question of whether there is a constitutionally protected right to intrastate travel]), SARA does not violate any such right. Parolees subject to SARA have only conditional liberty (*Morrissey*, 408 US at 480). They have no liberty interest, let alone a fundamental right, to be free from special conditions of parole (*see Robles v Williams*, 2007 WL 2403154, *4, 2007 US Dist LEXIS 62052, *10 [SD NY, Aug. 22, 2007, No. 02-Civ-6102 (PAC) (DCF)]). Quite the opposite, they have no constitutional right to be granted parole (*Matter of Williams*, 71 AD3d at 525). Even if SARA were to implicate a deprivation of petitioner's liberty right, that right would not be a fundamental one. Therefore, the standard of review under both the Federal and State Constitutions is a lenient one and the burden of proof is on the party attacking the legislative enactment (*Affronti v Crosson*, 95 NY2d 713, 719 [2001], *cert*

*denied* 534 US 826 [2001]). The inquiry is only whether SARA bears a rational relationship to the legitimate government interest it seeks to advance (*People v Knox*, 12 NY3d at 67). This analysis, like the rational relationship analysis for the Ex Post Facto Clause, affords a legislative enactment a strong presumption of constitutionality (*Heller v Doe* at 319; *People v Knox* at 69). As the Court of Appeals stated in *Affronti v Crosson*:

> "[t]he rational basis standard of review is a para-digm of judicial restraint. On rational basis review, a statute will be upheld unless the disparate treat-ment is so unrelated to the achievement of any combination of legitimate purposes that . . . [it is] irrational. Since the challenged statute is presumed to be valid, [t]he burden is on the one attacking the legislative arrangement to negative every conceiv-able basis which might support it . . . *whether or not the basis has a foundation in the record*. Thus, those challenging the legislative judgment must convince the court that the legislative facts on which the [statute] is apparently based could not reasonably be conceived to be true by the govern-mental decisionmaker" (95 NY2d at 719 [internal quotation marks and citations omitted]).

We find that under this highly deferential standard, SARA does not violate any of petitioner's substantive due process rights.

Accordingly, the judgment of the Supreme Court, New York County (Michael D. Stallman, J.), entered January 28, 2014, denying the petition, dismissing the proceeding, and declaring that Executive Law § 259-c (14), as amended by the Laws of 2005 (ch 544, § 2), is not unconstitutional on its face or as ap-plied to petitioner, should be affirmed, without costs.

KAPNICK, J. (dissenting in part). I agree with the majority's holding that "both SARA, as originally enacted, and the 2005 amendments, were intended to be civil measures designed to protect the public." However, I depart from the majority's hold-ing insofar as it concludes that the statute is not punitive in its effect and does not violate petitioner's substantive due process rights. In my view, the 1,000-foot buffer zone constitutes a retroactive punishment imposed on petitioner and other sex of-fenders who committed their crimes before the amendment of Executive Law § 259-c (14), in violation of the Ex Post Facto

Clause of the United States Constitution, because the civil intent of the Sexual Assault Reform Act (SARA) is negated by the statute's punitive effect (see *Smith v Doe*, 538 US 84, 92, 97 [2003]). I reach this conclusion after considering the relevant factors referred to in *Smith* (538 US at 97, citing *Kennedy v Mendoza-Martinez*, 372 US 144, 168-169 [1963]) and employed by the majority's analysis. These factors look to "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose" (*Smith*, 538 US at 97).

Petitioner's unrebutted evidence establishes that he is barred from living in or traveling to virtually all parts of Manhattan, where he allegedly lived for more than 20 years before his incarceration, and large areas of the other boroughs of New York City.[1] His parole officer's office is located in a dense area of central Manhattan, as are substance abuse and sex offender treatment programs that he is required to attend and the offices of his attorney and social worker. Those locations all appear to be in no-go zones, according to the map petitioner submitted, and apparently petitioner would be required to enter no-go zones to reach them regardless of where he resided in New York City.[2]

Even the majority concedes that "[t]here is no question that SARA on its face imposes affirmative restraints on petitioner, as well as anyone else to which it applies." These affirmative restraints are "not [merely] residency restriction[s], but [constitute] a comprehensive movement restriction" (*Devine v Annucci*, 45 Misc 3d 1001, 1007 [Sup Ct, Kings County 2014] [analyzing the punitive effect of Executive Law § 259 (c) (14)]). Further, the majority agrees that this restriction amounts to "banishment," which is defined as "compelling [an individual] to quit a city, place, or country, for a specific period of time" (*United States v Ju Toy*, 198 US 253, 269 [1905, Brewer, J., dissenting]) and has historically been regarded as a form of punishment (see *Stogner v California*, 539 US 607, 614 [2003], citing *Calder v Bull*, 3 US 386 [1798]; see also *Ju Toy*, 198 US at 269 ["The forcible removal of a citizen from his country . . .

---

1. Indeed, a discretionary condition of petitioner's parole prevents him from leaving the City of New York without receiving prior permission from his parole officer.

2. As noted by the majority, even the Bellevue shelter where parolees subject to SARA were formerly placed by respondent Department of Corrections and Community Supervision, has been determined to be within a prohibited buffer zone and can no longer serve as SARA-compliant housing.

by whatever name called . . . is always considered a punishment"]). Moreover, the majority does not disagree that the operation of the statute "serve[s] the goal of deterrence[,]" which is a traditional aim of punishment (*Mendoza-Martinez*, 372 US at 168).

It would appear, even in the majority's view, that these factors weigh in petitioner's favor. Nevertheless, the majority holds that "[b]ecause . . . SARA only applies to parolees, who otherwise have restricted liberty, these factors do not strongly support a conclusion that SARA is punitive in effect." To support this assertion, the majority cites *Morrissey v Brewer* (408 US 471, 482 [1972]) and *Matter of Williams v New York State Div. of Parole* (71 AD3d 524 [1st Dept 2010], *appeal dismissed* 15 NY3d 770 [2010], *lv denied* 15 NY3d 710 [2010]), neither of which address alleged violations of the Ex Post Facto Clause or consider the *Smith* factors. Indeed, *Morrissey* only concerned the narrow question of whether the Due Process Clause of the Fourteenth Amendment generally applies to parole revocations (408 US at 472), and *Williams* examined a CPLR article 78 petition, in which a parolee challenged a specific special condition of his parole, which limited the contact he was allowed to have with his wife (71 AD3d at 524). These cases certainly make clear that parolees are uniquely situated, as they are properly subject to many restrictions not applicable to other citizens, but also enjoy more liberty than those who are incarcerated (*Morrissey*, 408 US at 482). However, the majority does not cite any cases to support the notion that these *Smith* factors, which tend to show the punitive effect of the subject law, may be discounted or disregarded simply because parolees hold a restricted liberty interest. In my view, these *Smith* factors clearly support a finding that the 2005 amendment is punitive in its effect and therefore violates the Ex Post Facto Clause.

As the majority points out, the next factors are the most important considerations in this analysis (*Smith*, 538 US at 102). It is instructive to note that petitioner does not challenge the part of the law barring him from entering the real property boundaries of schools; rather, he challenges the amendment adding an additional buffer of 1,000 feet around schools, which seems to be equivalent to about four short blocks in Manhattan.[3] Contrary to the majority's holding, nothing in the record, in

---

**3.** One thousand feet is about .19 mile. One mile down a north-south avenue in Manhattan is about 20 blocks (*see* Michael Pollak, *Knowing the Distance*, NY Times, Sep. 17, 2006, available at http://www.nytimes.com/2006/09/17/nyregion/thecity/17fyi.html [accessed Dec. 16, 2015]). Thus, 1,000 feet equals about four blocks down a north-south avenue on the Manhattan

the legislative findings, or in common knowledge leads to the conclusion that a buffer zone as large as 1,000 feet has a rational connection to the legitimate state interest of protecting children from being victimized by sex offenders. Indeed, petitioner points to data that supports the notion that sex crimes are generally committed by someone known to the victim, especially when it comes to child victims.

Additionally, the majority's statement that petitioner must meet the burden of showing that the amendment "serves no legitimate governmental purpose" (citing *Ciafone v Kenyatta*, 27 AD3d 143, 151-152 [2d Dept 2005]) is somewhat misleading. Rather, "a law need have only a rational relationship to a legitimate state interest; . . . even if the law appears unwise or works to the detriment of one group or the other" (*Ciafone*, 27 AD3d at 152 [holding that a law that provided victims of crime a civil mechanism to seek financial redress against their assailants is rationally related to the State's interest in ensuring that victims are compensated by those that harm them]). Here, I do not dispute that the State has a legitimate governmental interest in protecting children from convicted sex offenders. In my view, however, there is an insufficient factual context to support a rational connection between the 1,000-foot movement and residency restriction and its stated legitimate purpose of protecting children from sex offenders (*see Romer v Evans*, 517 US 620, 632-633 [1996]).

A lack of a rational relationship between the amendment and its stated purpose is also apparent from the fact that it only applies to paroled sex offenders, without any reference to statistics or data supporting the notion that recidivism rates among paroled sex offenders is any higher than those who are released without parole. Additionally, I point out that the alleged rational relationship here between the amendment and its intended purposes is very different from the situations cited by the majority where various types of criminal offenders are barred from contact with their *actual, not potential*, victims or where orders of protection are issued.

As to the final factor, the petitioner points to two ways in which the amendment is excessive in relation to its purpose. First, it applies to certain sex offenders (those designated a level

---

grid, although there is some slight variation (20 x .19 = 3.8). The distance between north-south avenues is a less useful benchmark because that distance variesmore widely (*see id.*). Insofar as those facts are not in the record, this Court may take judicial notice of such "facts of common and general knowledge" that have been "authoritatively settled" (*Walker v City of New York*, 46 AD3d 278, 282 [1st Dept 2007]).

three sex offender under the Sex Offender Registration Act), regardless of the age of their victim. The amendment is also excessive in making the ban effective 24 hours a day, 365 days a year, which includes times when schools predictably will be closed.

Based on the foregoing, I would find that petitioner has met his burden to rebut the presumption of constitutionality of the amendment (*see LaValle v Hayden*, 98 NY2d 155, 161 [2002]) and would find that it is punitive in its effect and therefore violates the Ex Post Facto Clause.

As to petitioner's argument that he was deprived of a fundamental constitutional right to travel, I agree with the majority that even assuming that a constitutional right to intrastate travel exists (*see King v New Rochelle Mun. Hous. Auth.*, 442 F2d 646, 648 [2d Cir 1971], *cert denied* 404 US 863 [1971]), "an individual's constitutional right to travel . . . [is] legally extinguished by a valid conviction followed by imprisonment, [and] is not revived by the change in status from prisoner to parolee" (*Bagley v Harvey*, 718 F2d 921, 924 [9th Cir 1983]).

In the absence of a fundamental constitutional right, petitioner's substantive due process claim under the United States Constitution depends upon whether the SARA amendment's deprivation of his liberty meets "the (unexacting) standard of rationally advancing some legitimate governmental purpose" (*Reno v Flores*, 507 US 292, 306 [1993]). Under the more protective Due Process Clause of the New York State Constitution (*see People v LaValle*, 3 NY3d 88, 127 [2004]), petitioner's due process claim "requires a balancing of the competing interests at stake: the importance of the right asserted and the extent of the infringement are weighed against the institutional needs and objectives being promoted" (*Matter of Lucas v Scully*, 71 NY2d 399, 406 [1988]). For the reasons discussed above as to the lack of a rational connection between the restriction and its stated goal and the excessiveness of the restriction in relation to the goal, I would find that the 2005 SARA amendment violates petitioner's right to substantive due process under both the Federal and State Constitutions.

ANDRIAS, J.P., and MOSKOWITZ, J., concur with GISCHE, J.; KAPNICK, J., dissents in part in a separate opinion.

Judgment, Supreme Court, New York County, entered January 28, 2014, affirmed, without costs.