[50 NYS3d 597]

In the Matter of MIGUEL GONZALEZ, Appellant, v ANTHONY J. ANNUCCI, as Acting Commissioner of Corrections and Community Supervision, Respondent.

Third Department, March 23, 2017

## APPEARANCES OF COUNSEL

*Jill K. Sanders*, *Center for Appellate Litigation*, New York City, for appellant.

*Eric T. Schneiderman*, *Attorney General*, Albany (*Zainab A. Chaudhry* of counsel), for respondent.

## OPINION OF THE COURT

GARRY, J.

Appeal from a judgment of the Supreme Court (Hard, J.), entered July 20, 2015 in Albany County, which, in a proceeding pursuant to CPLR article 78, dismissed the petition.

Petitioner pleaded guilty to the crime of rape in the second degree and, on April 3, 2012, was sentenced to 2½ years in prison to be followed by three years of postrelease supervision (hereinafter PRS). Petitioner was subsequently adjudicated a risk level one sex offender pursuant to the Sex Offender Registration Act (*see* Correction Law art 6-C). Due to the victim's age, petitioner was subject to the provisions of the Sexual Assault Reform Act (L 2000, ch 1, § 8, as amended by L 2005, ch 544, § 2 [hereinafter SARA]) prohibiting him from, while on PRS, residing within 1,000 feet of a school or place where children congregate (*see* Executive Law § 259-c [14]; Penal Law § 220.00 [14]). Having earned a credit of four months and 10 days of good time, petitioner's conditional release date was May 20, 2014. Petitioner was not released on his conditional release date due to his inability to secure an approved residence.

The maximum expiration date of petitioner's prison sentence was September 30, 2014. Shortly before that date, the Department of Corrections and Community Supervision (hereinafter DOCCS) advised petitioner that as he still had not secured a residence that complied with the provisions of SARA, he was being transferred to Woodbourne Correctional Facility, an approved residential treatment facility (hereinafter RTF) (*see* 7 NYCRR 100.50 [c] [2]), to begin serving his term of PRS there until an approved residence was secured. Petitioner arrived at that facility on September 30, 2014, and, in October 2014, filed

an inmate grievance challenging his placement at Woodbourne on various grounds.[1] Following a consolidated hearing with other inmates who were also challenging their placement at Woodbourne, an Inmate Grievance Review Committee found only that there was insufficient evidence before it to support Woodbourne's designation as an RTF. Upon administrative review, the Superintendent of Woodbourne found that petitioner was assigned to an appropriate RTF, that he was afforded various employment and programming opportunities provided by law that are not available to general population inmates, and that he had received appropriate assistance in the process of securing SARA-compliant housing. Having sought review but receiving no response from the Central Office Review Committee, petitioner commenced this CPLR article 78 proceeding. While the proceeding was pending, petitioner was released from Woodbourne to a SARA-compliant homeless shelter in Manhattan in February 2015. Based upon petitioner's release, Supreme Court dismissed the petition as moot and declined to apply the exception to the mootness doctrine. Petitioner appeals.

Initially, we address petitioner's contention that he was denied his good time allowance and that he should have been released on his May 20, 2014 conditional release date. Under the Penal Law, "[a] period of [PRS] shall commence upon the person's release from imprisonment to supervision by [DOCCS]" (Penal Law § 70.45 [5] [a]). Had petitioner been released or transferred to Woodbourne on his May 20, 2014 conditional release date, or sometime prior to his September 30, 2014 maximum expiration date, his three-year term of PRS would have commenced at that time instead of on September 30, 2014, when he was ultimately transferred to Woodbourne. Thus, as petitioner currently remains on PRS until September 30, 2017, we agree that his claim in this regard is not moot.

Nevertheless, we are not persuaded that the claim has merit. "Whether to withhold an inmate's good time allowance is a discretionary determination and is not subject to judicial review as long as it is made in accordance with [the] law and is

---

1. Petitioner challenged Woodbourne's designation as an RTF, the determination by DOCCS to place him in a facility more than 100 miles from the community where he intended to reside upon his release, the appropriateness of the reintegration program at Woodbourne and the failure of DOCCS to place him in an RTF upon reaching his conditional release date in May 2014.

based upon a review of [the] inmate's entire institutional record" (*Matter of Fowler v Fischer*, 98 AD3d 1212, 1212 [2012] [internal quotation marks and citations omitted]; *see* Correction Law § 803 [4]; *Matter of Thomas v Fischer*, 106 AD3d 1343, 1344 [2013]). In view of the nature of petitioner's conviction and the mandatory character of the housing condition imposed by Executive Law § 259-c (14), we find no irrationality or abuse of discretion in the decision to withhold petitioner's good time allowance and deny him conditional release based upon his failure to find SARA-compliant housing (*see Matter of Boss v New York State Div. of Parole*, 89 AD3d 1265, 1266 [2011]; *see also Matter of Breeden v Donnelli*, 26 AD3d 660, 660-661 [2006]).

■ Next, we agree with Supreme Court that, as petitioner was released from Woodbourne to SARA-compliant housing in February 2015, his challenges regarding his placement at Woodbourne and the conditions of that placement are moot (*see People ex rel. Cuccio v Racette*, 138 AD3d 1364, 1365 [2016]; *People ex rel. Green v Superintendent of Sullivan Corr. Facility*, 137 AD3d 56, 58 [2016]; *People ex rel. Lashway v Wenderlich*, 118 AD3d 1199, 1200 [2014]; *Matter of McCants v Le Claire*, 14 AD3d 736, 736 [2005]). However, we disagree with that court's finding relative to the exception to the mootness doctrine. The exception applies where there is "(1) a likelihood of repetition, either between the parties or among other members of the public; (2) a phenomenon typically evading review; and (3) a showing of significant or important questions not previously passed on, i.e., substantial and novel issues" (*Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714-715 [1980]; *accord Matter of Schermerhorn v Becker*, 64 AD3d 843, 845 [2009]). Notably, the circumstances presented are highly similar to those in *People ex rel. Green v Superintendent of Sullivan Corr. Facility* (137 AD3d at 58), where this Court found the exception to the mootness doctrine to apply to a challenge raised by a risk level three sex offender with mental health issues who was imprisoned beyond his maximum expiration date because he had not secured appropriate housing.

Petitioner is an indigent sex offender from the New York City metropolitan area. Respondent's submissions, which include various policy directives and other communications detailing the housing-related services that DOCCS provides to sex offenders in its custody, reveal that the problems that petitioner encountered in finding appropriate housing are all

too common (*see generally People v Diack*, 24 NY3d 674, 682-683 [2015]; *Matter of Williams v Department of Corr. & Community Supervision*, 136 AD3d 147, 149-150 [2016]). Respondent's explanations of the underlying reasons for petitioner's placement in the RTF at Woodbourne and the delay of approximately four months before he was ultimately placed in a SARA-compliant homeless shelter expressly acknowledge that many others are in the same position, particularly in the New York City metropolitan area. The ultimate placement obtained was one of only four authorized homeless shelters in New York City that accept individuals subject to SARA restrictions. We agree with petitioner that, due to the "recognized difficulty in securing acceptable housing" for persons subject to sex offender residency restrictions, there is a likelihood of repetition regarding individuals being placed in RTFs due to the failure to secure suitable housing (*People ex rel. Green v Superintendent of Sullivan Corr. Facility*, 137 AD3d at 58). Given the transitory purpose of RTFs and considering the lack of appellate precedent regarding challenges to RTF placements and programing, we further recognize that the phenomenon typically evades review (*see City of New York v Maul*, 14 NY3d 499, 507 [2010]; *see generally* Penal Law § 70.45 [3]). Finally, we find the issues novel and substantial given that petitioner's challenges concern whether RTFs are serving their distinct purpose, as contrasted with confinement facilities generally (*see* Correction Law § 2 [6]).

Turning first to petitioner's challenges related to Woodbourne's programming, facilities and designation as an RTF, petitioner alleges that, although he was nominally transferred to an RTF, the conditions of his placement were in fact virtually indistinguishable from continued incarceration in a prison facility. Petitioner contends that, for the period between the expiration of his sentence and his ultimate release, he was confined in a prison setting among other inmates with essentially no greater liberties or freedom. This contention was supported, at least in part, by petitioner's descriptions of the circumstances of his placement, the affidavit testimony of family members who visited him at the facility and by respondent's concession that his assigned living space was a numbered cell. Nevertheless, to the extent that petitioner has not abandoned his facial challenge to the 1984 amendment to 7 NYCRR 100.50 (c) (2) that designated Woodbourne as an RTF, we agree with Supreme Court that it is time-barred. As for

petitioner's challenge to the conditions of his placement as applied to him, the limited record evidence failed to demonstrate that DOCCS's determination to place petitioner at Woodbourne was irrational or failed to comply with its statutory and regulatory obligations (*see* Correction Law §§ 2 [6]; 73 [1], [2], [10]).

We reach a different conclusion as to petitioner's contention that DOCCS failed to provide him with adequate assistance in finding appropriate housing during his stay at Woodbourne. Correction Law § 201 (5) imposes an obligation upon DOCCS to assist inmates who are on community supervision in securing "employment, educational or vocational training, and housing" (*see Matter of Boss v New York State Div. of Parole*, 89 AD3d at 1266). During the period of petitioner's stay at Woodbourne, DOCCS thus had a legal duty to assist him in finding appropriate housing. Relying upon this Court's prior decision in *People ex rel. Green v Superintendent of Sullivan Corr. Facility* (137 AD3d at 60), respondent asserts that it was petitioner's sole responsibility to locate and identify appropriate housing, and that DOCCS's duty "[was] only to assist him."[2] However, this argument turns *Green* on its head. Our language in that case relative to this duty was not intended to shift responsibility for finding appropriate housing away from DOCCS, but instead highlighted its affirmative obligation to assist sex offenders "*in the process*" of finding appropriate housing (*id.* [emphasis added]). The purpose and underlying public policy goal is that of avoiding recidivism, which, as we noted, is less likely when sex offenders have appropriate housing and employment. Put another way, the language of our prior decision expressly indicated that the duties of DOCCS in this realm are affirmative and significant, not merely secondary to those imposed upon petitioner.

DOCCS's efforts were insufficient to satisfy its affirmative duty. The submissions describing the housing-related efforts made by DOCCS officials during petitioner's placement at Woodbourne make clear that virtually the only "assistance" offered to petitioner involved waiting for him—then confined in an RTF located within the walls of a medium security prison,

---

2. Indeed, DOCCS has expressly incorporated this position within the special conditions imposed upon all inmates subject to Executive Law § 259-c (14) who have not developed an approved residence when they become eligible for release to community supervision. The special condition reads as follows: "[The inmate] will propose a residence to be investigated by [DOCCS] and will assist [DOCCS] in any efforts it *may* make on [his or her] behalf to develop a residence" (emphasis added).

without access to the Internet, without the ability to leave the facility to visit libraries, housing offices or potential residences, and with strictly limited access to telephone and correspondence privileges—to identify potential residences and to then investigate his proposals. The documents do reveal that officials provided petitioner—and other such offenders—with regular meetings inside the facility to discuss potential residences with offender rehabilitation coordinators, as well as less frequent meetings with parole officers outside the facility. However, from the submissions of both parties, it clearly appears that these meetings were geared primarily to the investigation and approval of residences that petitioner had somehow managed to identify. These meetings failed to include any affirmative assistance in locating such housing in the first place, such as the provision of information about potential residence opportunities, SARA-compliant areas or neighborhoods, referrals to community agencies or opportunities beyond those offered to regular inmates to use a telephone, computer or other resources to research residence opportunities (compare Matter of Cardew v Fischer, 115 AD3d 1193, 1194 [2014], lv denied 23 NY3d 904 [2014]). Nothing in respondent's submissions indicates that the employees who fulfill these roles are trained in identifying potential residences or housing-related information resources, or that they are expected to provide such assistance to offenders confined at Woodbourne. DOCCS's responsibilities for sex offenders in its custody already include the investigation and approval of their residences (see Correction Law § 203 [1]; see also Executive Law § 243 [4]). If such efforts, without more, are all that is required, then the additional affirmative statutory obligation to assist offenders in the process of finding housing—as separately imposed by Correction Law § 201 (5), and recognized by this Court in Green—is without meaning.

The record reveals that petitioner did manage to identify a significant number of potential residences, despite his confinement. Nonetheless, it is also clear that DOCCS officials did little or nothing to assist petitioner, and that his efforts were entirely fruitless as the officials disapproved each and every one of the 58 potential residences that petitioner had found. DOCCS officials did locate one potential placement for petitioner in a therapeutic residence on Staten Island; however, petitioner could not accept this placement as it was unsuitable in that he was indigent, could not afford the program's monthly

fee without a job, and could not hold a job while participating in the facility's therapeutic program. There is nothing in the record to indicate that officials provided petitioner with any manner of aid, such as other suggestions, referrals, information or any other form of affirmative assistance until his name eventually came up on the waiting list for placement in the SARA-compliant homeless shelter to which he was ultimately transferred.

The feasibility and appropriateness of the specific means by which DOCCS may choose to provide affirmative assistance in locating housing to petitioner are, of course, discretionary and beyond the reach of judicial review unless they are shown to be irrational, arbitrary and capricious. Accordingly, we may not specify the particular actions that DOCCS should have taken. Nevertheless, its passive approach of leaving the primary obligation to locate housing to an individual confined in a medium security prison facility 100 miles from his family and community, without access to information or communication resources beyond that afforded to other prison inmates, falls far short of the spirit and purpose of the legislative obligation imposed upon DOCCS to assist in this process.

Accordingly, we reverse the determination of Supreme Court to the extent that it found the exception to the mootness doctrine inapplicable, and, applying that doctrine and upon review, we further grant petitioner's request to convert this matter into a proceeding for a declaratory judgment[3] and issue a judgment declaring that DOCCS had an affirmative statutory obligation to provide substantial assistance to petitioner in identifying appropriate housing during his placement in Woodbourne and that, under the circumstances of that placement, the services that it provided to him fell short of that duty.

McCARTHY, J.P. (concurring in part and dissenting in part). We disagree with the majority's conclusion that the determination that petitioner received adequate assistance in the process of securing housing was irrational, arbitrary or capricious and, therefore, we respectfully dissent to that extent. The Department of Corrections and Community Supervision (hereinafter DOCCS) is statutorily obligated to "assist inmates eligible for community supervision and inmates who are on community supervision to secure . . . housing" (Correction Law § 201 [5];

---

3. Contrary to respondent's assertion, we find that this request was preserved for appellate review.

*see People ex rel. Green v Superintendent of Sullivan Corr. Facility*, 137 AD3d 56, 60 [2016]). During petitioner's stay at Woodbourne Correctional Facility, officials met with petitioner numerous times to review, investigate and propose potential residences in regard to compliance with the Sexual Assault Reform Act (L 2000, ch 1, § 8, as amended by L 2005, ch 544, § 2 [hereinafter SARA]). Between petitioner's arrival at Woodbourne on September 30, 2014 and his release on February 4, 2015,[1] offender rehabilitation coordinators met with petitioner on nine separate dates to aid him in securing SARA-compliant housing. Petitioner's parole officer met with him on at least six separate occasions during the same period to provide similar assistance.[2] Officials conducted investigations into 58 residences proposed by petitioner,[3] none of which were ultimately found to be SARA-compliant. Records indicate that officials sought proposals for residences from petitioner, at least in part, so that they could consider his preferences in their efforts to assist him in securing SARA-compliant housing.

The record further establishes that, in addition to investigating the SARA compliance of the 58 residences proposed by petitioner, officials made further efforts to identify and secure SARA-compliant housing for him. More specifically, officials made efforts to house petitioner at "Harrison House," but the record establishes that there were no beds available at that facility. Thus, officials made arrangements to have petitioner's name placed on that facility's waiting list. In addition, a record entry from January 2015 indicates that petitioner advised officials that he was "now interested in Harrison House and like facilities." Thus, it is reasonable to infer from this entry that officials had previously suggested said facility and others like it and that petitioner had indicated a lack of interest in living in such facilities.

Finally, petitioner acknowledges that officials provided him with the opportunity to reside at a SARA-compliant residential

---

1. DOCCS was empowered to transfer petitioner to Woodbourne for a term "not exceeding six months" (Penal Law § 70.45 [3]), and petitioner secured SARA-compliant housing after approximately four months of residing at Woodbourne.

2. Thus, considering the meetings with offender rehabilitation coordinators and petitioner's parole officer, petitioner met with officials to receive housing assistance, on average, approximately every eight days during his placement at Woodbourne.

3. Although petitioner emphasizes his lack of Internet access and limited phone privileges, the proof establishes that available resources permitted him to identify 58 potential residences.

therapeutic program at a cost of $620 a month.[4] Petitioner declined this opportunity given that the programing would not permit him to work, and without working he would be unable to afford the rent. It was not irrational to assist petitioner by proposing such a residence merely because he was ultimately unable to avail himself of the opportunity due to programing restrictions and cost. Finally, the record reflects that petitioner brought his grievance in the midst of DOCCS's efforts, and it is uncontested that DOCCS ultimately secured a SARA-compliant residence for petitioner consistent with his indigent status in New York City's Department of Homeless Services. Based on the foregoing record, it was not irrational, arbitrary or capricious to conclude that petitioner received adequate assistance in the process of securing SARA-compliant housing (*see generally People ex rel. Green v Superintendent of Sullivan Corr. Facility*, 137 AD3d at 60; *Matter of Boss v New York State Div. of Parole*, 89 AD3d 1265, 1266 [2011]). Accordingly, we would affirm the judgment.

LYNCH and AARONS, JJ., concur with GARRY, J.; MCCARTHY, J.P., concurs in part and dissents in part in a separate opinion in which ROSE, J., concurs.

Ordered that the judgment is modified, on the law, without costs, by partially converting the matter into a declaratory judgment action; it is declared that (1) when a person whose prison sentence has expired and who is subject to the mandatory condition set forth in Executive Law § 259-c (14) is placed in a residential treatment facility pursuant to Penal Law § 70.45 (3) and Correction Law § 73 (10), the Department of Corrections and Community Supervision has an affirmative obligation pursuant to Correction Law § 201 (5) to provide substantial assistance to the person in locating appropriate housing and (2) the services provided to petitioner by the Department of Corrections and Community Supervision in locating such appropriate housing during his placement in the residential treatment facility at the Woodbourne Correctional Facility between September 30, 2014 and his subsequent release on February 4, 2015 were not adequate to satisfy that duty; and, as so modified, affirmed.

---

4. Inasmuch as petitioner does not name the proposed facility, it is unclear whether he is referring to Harrison House. If petitioner is referring to Harrison House, the aforementioned evidence that he affirmatively indicated an interest in residing at that facility would further justify DOCCS's efforts as to housing petitioner there.