Matter of Gonzalez v Annucci (2018 NY Slip Op 08057)

Matter of Gonzalez v Annucci

2018 NY Slip Op 08057 [32 NY3d 461]

November 27, 2018

DiFiore, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, March 6, 2019

[*1]

In the Matter of Miguel Gonzalez, Respondent-Appellant,
v
Anthony J. Annucci, as Acting Commissioner of Corrections and Community Supervision, Appellant-Respondent.

Argued October 16, 2018; decided November 27, 2018

Matter of Gonzalez v Annucci, 149 AD3d 256, modified.

{**32 NY3d at 465} OPINION OF THE COURT

Chief Judge DiFiore.

The primary issue presented on appeal is whether the Appellate Division erred in holding that the Department of Corrections and Community Supervision (DOCCS), which must "assist" {**32 NY3d at 466}inmates on or eligible for community supervision to secure housing pursuant to Correction Law § 201 (5), has an obligation to provide sex offenders residing in a residential treatment facility (RTF) with substantial assistance in identifying appropriate housing. We hold that the Court erred in imposing a heightened duty of substantial assistance on DOCCS, and conclude that the agency met its statutory obligation to assist petitioner in this particular case.
I.
Petitioner was convicted, upon his guilty plea, of rape in the second degree under Penal Law § 130.30 (1). He was sentenced to a determinate sentence consisting of 21/2 years' imprisonment followed by 3 years' postrelease supervision (PRS). The maximum expiration date of his prison sentence was September 30, 2014. In early May 2014, petitioner was advised by the Time Allowance Committee at Franklin Correctional Facility that his accumulated good time credit amounted to four months and 10 days and that he was eligible for conditional release [*2]to PRS on May 20, 2014. Had petitioner been released on his conditional release date, the maximum expiration date of his PRS would have been three years from that date, or May 20, 2017.
Based on the sex offense for which petitioner was convicted and the fact that the victim of the offense was 14 years old at the time of the offense, petitioner's supervisory release was subject to the mandatory condition set forth in the Sexual Assault Reform Act (SARA) prohibiting him from residing within 1,000 feet of school grounds (see Executive Law § 259-c [14]; Penal Law §§ 220.00 [14]; 65.10 [4-a] [a]). In accordance with this statutory requirement, one month prior to petitioner's conditional release date, the Board of Parole imposed a special condition on his release. That condition required petitioner to propose an appropriate SARA-compliant residence to be investigated and approved by DOCCS. Petitioner identified one potential residence prior to his May 2014 conditional release date but that residence did not qualify as SARA-compliant housing. Since he was unable to satisfy the mandatory condition of his supervisory release, DOCCS held him in custody beyond his May 20, 2014 conditional release date. Petitioner continued to identify potential residences and discuss them with his parole officer, but none of the proposed residences he identified satisfied the mandatory special condition. As a result,{**32 NY3d at 467} petitioner lost all of his good time credit, and DOCCS kept petitioner incarcerated until September 30, 2014, the maximum expiration date for the imprisonment portion of his determinate sentence. Accordingly, the expiration date of his three-year term of PRS, the remaining portion of his determinate sentence, was extended to September 30, 2017. Prior to his release, petitioner was adjudicated a level one sex offender.
Because petitioner was unable to identify a suitable residence by his maximum expiration date, the Board of Parole imposed, as a condition of his PRS, that petitioner be transferred to Woodbourne Correctional Facility—a residential treatment facility (see Penal Law § 70.45 [3]; Correction Law § 2 [6]). Specifically, under Penal Law § 70.45 (3), the Board of Parole is authorized to require, as a condition of PRS, that an inmate be transferred to and participate in the programs of an RTF for a period of no more than six months upon his or her release from the underlying term of imprisonment. Woodbourne is a medium security correctional facility that DOCCS has designated for use as an RTF (see 7 NYCRR 100.50 [c] [2]). Petitioner remained at Woodbourne until February 4, 2015, when he was released on supervision to a SARA-compliant shelter in Manhattan.
In December 2014, petitioner commenced this CPLR article 78 proceeding asserting that DOCCS failed to provide him with assistance in locating housing. He also challenged the agency's determination to designate Woodbourne as an RTF, asserting, among other things, that the facility did not comply with the statutory requirements of an RTF under Correction Law §§ 2 and 73 and that he was therefore being held in an illegal RTF.[FN1] In addition, petitioner asserted that the determination to deprive him of all of his good time credit was made in violation of lawful procedure and due process.[FN2]
In disputing that Woodbourne was a legal RTF, petitioner argued that he was effectively being incarcerated in a facility{**32 NY3d at 468} that was not community-based as it was well outside of the Manhattan community to which he planned to [*3]return. He also claimed he was confined under the same restrictions as inmates who were serving their prison sentences at that same medium security facility. Petitioner further maintained that he did not receive any rehabilitative programming directed toward his reintegration into the community while at Woodbourne as required by Correction Law § 73. Although he admittedly participated in Woodbourne's RTF program for a portion of his stay at that facility, he claimed that the program was no different from the "Phase Three" program he had already completed as part of his sentence of imprisonment—a program that was required to be completed by all inmates prior to their release from incarceration. Petitioner's participation in the RTF program apparently terminated when he began his assignment to an outside work crew.
In support of his claim that DOCCS did not provide him with assistance in locating SARA-compliant housing, petitioner alleged that he was assigned to a Poughkeepsie-area parole officer and not one from New York City. Petitioner was permitted to leave the Woodbourne facility to make weekly visits to the parole officer but objected to the fact that he was under the supervision of correction officers at all times. He asserted that, at those visits, the parole officer would merely ask him whether he had located any suitable housing. Petitioner acknowledged that the parole officer affirmatively proposed a single housing option for him—a therapeutic community in Staten Island at a monthly cost of $620, which petitioner rejected as he could not afford it. He essentially contended that DOCCS' assistance was insufficient in light of the circumstances of his continued incarceration at the RTF, including his limited access to the telephone and lack of access to the Internet.
In opposition, DOCCS maintained that petitioner was retained beyond his conditional release date because he was unable to satisfy the special condition imposed by the Board of Parole—the SARA residency requirement—and, based on his continued inability to find a suitable residence, he was properly transferred to Woodbourne as a condition of his PRS on his maximum expiration date. DOCCS provided an affidavit from a supervising offender rehabilitation coordinator (SORC) who averred that, in general, RTF inmates "meet and collaborate with DOCCS staff with greater frequency than non-sex-offender inmates, with an emphasis on identifying lawful and{**32 NY3d at 469} otherwise appropriate residences." Moreover, the SORC referenced the DOCCS directive requiring that all parolees subject to SARA residency restrictions meet with offender rehabilitation coordinators and that these coordinators "submit any new residence proposals for investigation by Community Supervision field personnel on a priority basis." The SORC also asserted that petitioner, as an RTF resident, earned higher wages than the Woodbourne inmates and that the bulk of those earnings were placed into a housing fund for petitioner that was exempt from garnishment by DOCCS.
As to rendering assistance to petitioner, DOCCS also submitted entries from its case management system (CMS) detailing many of the proposed residences identified by petitioner for investigation by DOCCS and why these residences were rejected for lack of SARA compliance. Notably, an entry dated November 28, 2014, states that petitioner had proposed 58 potential residences since March 2014. DOCCS identified nine dates on which petitioner had met with SORCs regarding SARA-compliant housing and 14 dates on which its personnel had recorded efforts to investigate residences for SARA compliance on petitioner's behalf. The CMS entries also indicate that petitioner was referred to parole reentry services.
Significantly, DOCCS also provided an affidavit from counsel to the Board of Parole, who affirmed that, in addition to investigating the residences proposed by petitioner for SARA-compliance, DOCCS' staff reached out to other agencies, including the local Department of Social Services, to ascertain whether they could provide housing for petitioner. An assistant commissioner for population management at DOCCS provided the reasons for petitioner's placement at Woodbourne explaining in her affidavit that, although there were RTFs that were closer to Manhattan, Woodbourne was the closest appropriate option for petitioner based on the programming that was available as well as staffing considerations. The affidavit also explained that DOCCS partners with the Department of Homeless Services (DHS) in New York City to obtain suitable housing for indigent sex offenders who are returning to the city upon release. According to the affidavit, there are only four SARA-compliant DHS locations in New York City that accept parolees and individuals are accepted as space becomes available, with individuals who have been held the longest in RTFs being placed first.
Supreme Court denied the petition (56 Misc 3d 1203[A], 2015 NY Slip Op 52034[U] [Sup Ct, Albany County 2015]). Notwithstanding{**32 NY3d at 470} that petitioner had not yet completed his three-year term of PRS, the court concluded that his arguments were moot and that the exception to mootness did not apply. The court went on to conclude that, even if the issues were not moot, the petition should be denied on the merits.
[*4]
The Appellate Division agreed that the majority of the issues (except for petitioner's challenge to the loss of his good time credit, as the PRS term was still ongoing when the Court issued its decision) were moot, but held that the exception to mootness applied and reached the merits. The Court modified, on the law, by partially converting the matter to a declaratory judgment action and declaring that DOCCS has an affirmative statutory obligation to provide "substantial assistance" to inmates who have been placed in an RTF and who are subject to the mandatory residency restrictions in SARA in locating appropriate housing, and that DOCCS failed to satisfy its statutory duty to petitioner in this case (149 AD3d 256, 264 [3d Dept 2017]). As to petitioner's remaining arguments, the Court held that it was not irrational for DOCCS to withhold petitioner's good time credit while he was unable to locate SARA-compliant housing prior to the expiration of his prison sentence and that DOCCS' decision to transfer petitioner to Woodbourne upon completion of the prison sentence was not irrational or in violation of the agency's statutory and regulatory obligations.
Two Justices dissented in part and would have held that petitioner received adequate assistance in finding SARA-compliant housing. DOCCS appealed to this Court as of right (CPLR 5601 [a]) and we granted petitioner's motion for leave to cross-appeal.
II.
We reject DOCCS' assertion that the Appellate Division erred in invoking the exception to mootness to reach the issues raised on appeal. "In general an appeal will be considered moot unless the rights of the parties will be directly affected by the determination of the appeal and the interest of the parties is an immediate consequence of the judgment" (Matter of Hearst Corp. v Clyne, 50 NY2d 707, 714 [1980]). We have, however, invoked the exception to mootness to consider substantial and novel issues that are likely to be repeated and will typically evade review (see Hearst Corp., 50 NY2d at 714-715). Based on the dearth of SARA-compliant housing in New York City, and the resulting need for placement of sex offenders in RTFs for a{**32 NY3d at 471} period of no more than six months pursuant to Penal Law § 70.45, there is a clear likelihood that this issue will be repeated. Moreover, given the transitory duration of placement at the RTFs, the issues presented are likely to evade review (see City of New York v Maul, 14 NY3d 499, 507 [2010]). Finally, the issues presented are novel and substantial, raising the extent of DOCCS' statutory obligation to provide assistance in obtaining SARA-compliant housing. We therefore address the merits.[FN3] III.
As noted above, the primary issue presented is the extent of DOCCS' obligation to assist inmates in obtaining housing under Correction Law § 201 (5). "Where the interpretation of a statute or its application involves knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom, the courts regularly defer to the governmental agency charged with the responsibility for administration of the statute" (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980]). However, "[w]here [*5]the question is one of pure legal interpretation of statutory terms, deference to the [agency] is not required" (Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 102 [1997] [internal quotation marks and citation omitted]). Here, the statutory language is clear and no deference is required.
Under Correction Law § 201 (5), DOCCS "shall assist inmates eligible for community supervision and inmates who are on community supervision to secure employment, educational or vocational training, and housing." There is nothing set forth in the statutory language of section 201 (5) that imposes a heightened duty upon DOCCS to provide substantial assistance to an inmate seeking housing (cf. Correction Law § 73 [2] [DOCCS "shall be responsible for securing appropriate {**32 NY3d at 472}education, on-the-job training and employment for inmates transferred to (RTFs)"]). In interpreting the statute to require substantial assistance, the Appellate Division attempted to cabin what it viewed as DOCCS' greater responsibility to assist sex offenders residing in RTFs. DOCCS' obligation under section 201 cannot be so narrowly viewed because it is a general duty, quite expansive in scope and applicable to all inmates in the state prison system on or eligible for community supervision. Such a general duty cannot be defined by the intractable problems presented by inmates convicted of sex offenses who must obtain SARA-compliant housing and must do so in a very limited market without financial resources. Moreover, the statutory obligation to provide assistance is not restricted to providing housing, but equally applies to assistance in securing employment, education and vocational training for all inmates on or eligible for community supervision. It is unreasonable and impracticable to interpret this general duty of providing "assist[ance]" as imposing the burden on DOCCS of substantial assistance with respect to this broader class of inmates to secure each inmate housing, educational or vocational training, and employment.
We disagree with the Appellate Division majority's reasoning that DOCCS has an obligation to provide substantial assistance to inmates in petitioner's situation, in part, because of DOCCS' separate obligation to "investigat[e] and approv[e] the residence" of level two and three sex offenders (Correction Law § 203 [1]; Executive Law § 243 [4]), and that, in light of this existing obligation, the "additional affirmative statutory obligation" to provide assistance under Correction Law § 201 (5) would be rendered meaningless if satisfied by the investigation and approval of residences proposed by the inmate (149 AD3d at 263). First, we note that petitioner is a level one sex offender and, therefore, Correction Law § 203 (1) and Executive Law § 243 (4) do not apply to him. Those statutes cannot render section 201 (5) meaningless with respect to petitioner. In any event, Correction Law § 203 (1) and Executive Law § 243 (4) cannot be read to support the heightened burden on DOCCS that the Appellate Division would impose.
In People v Diack, we recognized that the State, in an effort to preempt rules imposed by individual localities to curtail the housing of sex offenders in their jurisdictions, assumed the responsibility for "maint[aining] and locat[ing]" acceptable housing for sex offenders and that regulations were promulgated{**32 NY3d at 473} to address this "enormous challenge" (24 NY3d 674, 684 [2015]). Indeed, those regulations—promulgated by the Division of Parole, the Division of Probation and Correctional Alternatives, and the Office of Temporary and Disability Assistance—acknowledge the enormous difficulty in finding appropriate housing for sex offenders, but they do not impose specific obligations on DOCCS beyond DOCCS' duty to investigate and approve residences for level two and three sex offenders (see 9 NYCRR 8002.7). By statute and regulation, for the indigent sex offender, it is the local Department of Social Services (DSS) that has the obligation to determine the placement of level two and three sex offenders in shelters (see Social Services Law § 20 [8] [b]; 18 NYCRR 352.36 [b]).[FN4] Through this scheme, the [*6]legislature required DSS, in placing the sex offender in shelters, to consider factors other than the mere availability of shelter, including the "investigation and approval of such placement by [DOCCS]" for public safety reasons (Social Services Law § 20 [8] [b] [v]; Correction Law § 203 [1]; Executive Law § 243 [4]). The legislation requiring the agencies to consider such factors was intended, in part, to specifically address the warehousing of level two and three sex offenders residing in SARA-compliant housing in concentrated locations and the resulting risk to public safety in those neighborhoods (L 2008, ch 568).
In contrast, under the plain language of section 201, DOCCS' obligation with respect to all inmates on or eligible for community supervision is to provide assistance in a general manner and certainly does not alleviate the ultimate obligation on the inmate to locate housing.[FN5] This assistance owed by DOCCS to the general population of inmates about to be released from{**32 NY3d at 474} state prison is unrelated to its particularized duty governed by Correction Law § 203 (1) and Executive Law § 243 (4) to assure the placement in housing by DSS of level two and three sex offenders consistent with the overarching concern of public safety. Even in this latter situation where these sex offenders have been designated for separate treatment, DOCCS is given a law enforcement task of investigation and is not the government agency that places a sex offender in any housing.
In sum, Correction Law § 201 (5) requires DOCCS to assist inmates prior to release and under supervision to secure housing. DOCCS has interpreted its obligation under the statute as satisfied when it actively investigates and approves residences that have been identified by inmates and when it provides the inmates with adequate resources to allow them to propose residences for investigation and approval. This interpretation is consistent with the plain language of the statute as well as the larger statutory framework. While the agency is free, in its discretion, to provide additional assistance to inmates in locating SARA-compliant housing—particularly where an inmate is nearing the maximum expiration date or is residing in an RTF with the associated restrictions on the ability to conduct a comprehensive search—there is no statutory basis in Correction Law § 201 (5) for imposing such an obligation.
[*7]
As to whether DOCCS met its obligation in this particular case, the record demonstrates that petitioner met biweekly with an ORC regarding SARA-compliant housing and also met several times with his parole officer. Petitioner was able to propose 58 residences which DOCCS investigated for SARA-compliance. The agency also affirmatively identified at least two housing options for petitioner in New York City—one was rejected by petitioner on the basis that he could not afford it and the other was the shelter in Manhattan where he was ultimately housed. Certainly, the record reflects that DOCCS{**32 NY3d at 475} provided more than passive assistance, given that it affirmatively contacted other agencies and providers on petitioner's behalf because of his financial needs. Indeed, petitioner was successfully placed with New York City's DHS through DOCCS' efforts, which were adequate to meet its statutory obligation to provide assistance.
Finally, we agree with the Appellate Division that there was insufficient record evidence to establish that DOCCS' determination to place petitioner at the Woodbourne RTF was irrational or that the conditions of his placement at that facility were in violation of the agency's statutory or regulatory obligations.[FN6] Notably, the record adequately establishes that, based on institutional considerations, Woodbourne was the closest available RTF in which to place petitioner. Additionally, the record demonstrates that petitioner was accorded the rights of a resident of an RTF, as opposed to an inmate.
The parties' remaining contentions are without merit.
Accordingly, the order of the Appellate Division should be modified, without costs, in accordance with this opinion and, as so modified, affirmed.

Rivera, J. (concurring in part and dissenting in part). I join sections I through III of the dissent, and agree fully with Judge Wilson's analysis and discussion of the proper interpretation of the Department of Corrections and Community Supervision's duty to assist petitioner Miguel [*8]Gonzalez pursuant to Correction Law § 201 (5), and the need for a hearing on petitioner's challenge to his placement at the Woodbourne Correctional Facility based on his claim that it failed to meet the requirements of a residential treatment facility. However, I agree with the majority (majority op at 
471 n 3) that the exception to the mootness doctrine does not apply to petitioner's good time credit claim. That issue remains open.

Wilson, J. (dissenting). Suppose you were moving to New York City and were looking for a place to live. As tens of thousands do each year, you turn to a real estate agent for assistance. You tell your agent the maximum rent you can afford and that you need an apartment within a certain proximity of a school, the subway and a park. The agent, however, does not{**32 NY3d at 476} give you a map of possible locations, or a set of listings, or even suggestions as to neighborhoods. Instead, the agent insists you play a game of real-estate Battleship: you guess an address, and the agent will tell you "hit" or "miss," depending on whether, based on the agent's inscrutable interpretation of your criteria, the address has a suitable apartment. After 58 misses and no hits, the agent finally proposes an apartment to you—one far outside of your price range. One more thing: until you win the game, you cannot leave. Have you been "assisted"?
According to the majority, this Kafkaesque[FN1] treatment is what the legislature meant when it imposed a duty on the New York State Department of Corrections and Community Supervision (DOCCS) to "assist inmates eligible for community supervision . . . to secure . . . housing" (Correction Law § 201 [5]). Thus, DOCCS claims it "assisted" Miguel Gonzalez to secure housing by providing him occasional access to a phone and periodically telling him that each residence he proposed was unsatisfactory. What's more, although Mr. Gonzalez's impeccable conduct while imprisoned earned him a substantial amount of good-time credit, he was stripped of that credit because he lost DOCCS's unwinnable game of real-estate Battleship. I am certain the legislature intended neither the process nor the result here, and therefore dissent.
[*9]I.
Mr. Gonzalez was employed as a guard at a middle school. After he left that employment, he had a sexual relationship with an underage former student of that school. He pleaded guilty to second-degree statutory rape on January 5, 2012. On April 3, 2012, he was sentenced to a determinate 21/2 years in prison followed by three years' postrelease supervision (PRS). His maximum term of imprisonment was set at September 30, 2014. While in prison, he acquired "good-time credit" (see Correction Law § 803 [1] [a]) that advanced his release date to May 20, 2014.
Mr. Gonzalez committed a serious crime and received a sentence deemed appropriate by the court, the People and Mr. Gonzalez. He then did what our corrections system aspires: he made an earnest effort to reform himself. He was a model inmate, fulfilling every rehabilitation program recommended to him, committing no disciplinary infractions, and accruing the{**32 NY3d at 477} maximum possible good-time credit (see Correction Law § 803 [1] [c]). He expressed a "high level [of] remorse, and has completed sex offender treatment, to which he responded very well and was found to be highly motivated" (People v Gonzalez, Sup Ct, NY County, Aug. 11, 2014, FitzGerald, J., indictment No. 2222/2011, slip op at 7-8). When the time came to assign Mr. Gonzalez a Sex Offender Registration Act (SORA) risk level,[FN2] the SORA court determined him to be a level one offender, the level reserved for offenders who pose the lowest possible risk to the community (id). Notably, the court emphasized Mr. Gonzalez's "supportive family and friends," noting that they were "important factors in rehabilitation" (id.; accord e.g. Rebecca L. Naser & Nancy G. La Vigne, Family Support in the Prisoner Reentry Process: Expectations and Realities, 43 J Offender Rehabilitation [No. 1] 93 [2006]).
As a level one sex offender, Mr. Gonzalez was subject to the Sexual Assault Reform Act (SARA) for the duration of his postrelease supervision period. SARA provides, in relevant part, that the parole "board shall require, as a mandatory condition of [postrelease supervision], that such sentenced offender shall refrain from knowingly entering into or upon any school grounds . . . or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen" (Executive Law § 259-c [14]). "School grounds" here means "any area accessible to the public located within one thousand feet of the real property boundary line" of any school (Penal Law § 220.00 [14]). DOCCS interprets SARA to permit it to detain all sex offender inmates (including level one offenders) until one of two events occurs: (a) the inmate secures housing that is at least 1,000 feet from any school and meets other DOCCS criteria; or (b) the inmate's postrelease supervision period terminates.
As Mr. Gonzalez's release date neared, DOCCS—fully aware of the restrictions placed on Mr. Gonzalez by its interpretation of SARA—did nothing to identify suitable housing for him. Instead, when his May 20, 2014 release date arrived, DOCCS{**32 NY3d at 478} revoked his good-time credit because DOCCS had yet to approve any of the housing options Mr. Gonzalez had proposed. By revoking the good-time credit, DOCCS then retained Mr. Gonzalez in prison until his maximum expiration date of September 30, 2014, and then "released" him to postrelease supervision in the Woodbourne Correctional Facility—a prison also designated as a residential treatment facility (RTF) (7 NYCRR 100.50 [c] [2]). Four months after that, DOCCS moved him into a homeless shelter on Randall's Island. Mr. Gonzalez's first choice was to live with his parents, who also wanted him to reside with them in their home, but DOCCS deemed that address unacceptable. By eliminating Mr. Gonzalez's good-time credit, DOCCS also extended the end of his postrelease supervision from May 20, 2017, to September 30, 2017.
[*10]
Indeed, that DOCCS entertained Mr. Gonzalez's proposal to live in New York City in the first place (despite it being, as the majority explains, "a very limited market [for those] without financial resources" [majority op at 
472]) likely stemmed from a rehabilitative motive that is, as I explain below, central to the legislature's directive under Correction Law § 201. As is true for more dangerous sex offenders (see Correction Law § 203 [1] [d]), exiling Mr. Gonzalez to some other part of the state—far away from the "supportive family and friends" the SORA court emphasized—would increase the risk that he might reoffend and disrupt his journey towards total social reintegration. Yet despite the importance of those networks, DOCCS swiftly denied Mr. Gonzalez's proposal to live with his parents.[FN3] It is hard to tell whether the irony or poor public policy is more striking: instead of permitting Mr. Gonzalez to live with his parents, DOCCS lengthened his prison stay and forced him into one of the four homeless shelters meant to accommodate every sex offender in New York City, including the highest-risk level three offenders. Which situation would best further his rehabilitation and reintegration and protect New York's children?{**32 NY3d at 479}
II.
The majority concludes that the above conduct satisfied DOCCS's duty under Correction Law § 201 (5) to "assist" Mr. Gonzalez to "secure . . . housing." In so concluding, the majority takes issue with the Appellate Division's articulation of DOCCS's duty: namely, that DOCCS must render "substantial" assistance, which the majority interprets (wrongly) as a "heightened" duty (majority op at 
466) on DOCCS, above and beyond that imposed by the statute.
Insofar as the majority thinks that the Appellate Division erred in applying the word "substantial" to describe DOCCS's duty to assist Mr. Gonzalez (majority op at 
472),[FN4] or that the Appellate Division erred in applying the various level two and three sex-offender laws to Mr. Gonzalez's case, the majority misses the point—the question is not what label to put on DOCCS's duty to its inmates, but the content (i.e., "substance") of that duty. More significantly, the majority's reasoning rests on the false premise that whatever "duty" means, it must mean the same for every inmate and the same for every obligation. We have not construed duties that way in any other area of law: doing so makes no sense.
Although the majority rejects the Appellate Division's understanding of the word "assist,"[FN5] it never explains just what it understands "assist" to mean. Instead, the best it can offer is that whatever "assist" means, when DOCCS[*11]"actively investigates and approves residences that have been identified by inmates and when it provides the inmates with adequate resources to allow them to propose residences for investigation and approval" (majority op at 
474), then DOCCS's actions are "adequate to meet its statutory obligation" (majority op at 
475). Whence comes that conclusion is a mystery.
Instead, to understand "assist," I would look to the legislature's "express purpose" for Correction Law § 201: "promot[ing] {**32 NY3d at 480}. . . inmates' successful and productive reentry into society" (L 2011, ch 62, § 1, part C, § 1, subpart A, § 1; cf. Riley v County of Broome, 95 NY2d 455, 463 [2000]; McKinney's Cons Laws of NY, Book 1, Statutes § 122). DOCCS itself was created to "provide for a seamless network for the care, custody, treatment and supervision of a person, from the day a sentence of state imprisonment commences, until the day such person is discharged from supervision in the community" (L 2011, ch 62, § 1, part C, § 1, subpart A, § 1).
The statutory scheme of the Penal Law and Correction Law as a whole should also inform our construction of the word "assist" (see Matter of M.B., 6 NY3d 437, 447 [2006]; People v Mobil Oil Corp., 48 NY2d 192, 199 [1979]). That scheme evinces a consistent effort to provide incentives for rehabilitation ("correction," if you will) and full integration into society, which also illuminates the way in which the legislature understood the word "assist."
Thus, incarcerated persons will earn time credit for "good behavior and efficient and willing performance of duties assigned or progress and achievement in an assigned treatment program" (Correction Law § 803 [1] [a]), transitioning into a "residential treatment facility" that is a "community based residence . . . where employment, educational and training opportunities are readily available for persons who are on parole [or postrelease supervision]" (Correction Law § 2 [6]). DOCCS must "encourage apprenticeship training" (Correction Law § 201 [7]) of inmates who might benefit from it. Once released, inmates have a statutory protection from discrimination by employers and others on the basis of their criminal records (see e.g. Correction Law § 752; Executive Law § 296 [15]-[16]). In all respects, the statutory scheme is one that seeks systematically to remove from the willing inmate the disabilities of past crimes and imprisonment, but recognizes DOCCS's assistance is vital to enhancing the prospects for rehabilitation and reintegration.[FN6]
{**32 NY3d at 481}Viewed in the context of the legislature's statements of intent and the overall statutory scheme, Correction Law § 201 (5)'s mandate that DOCCS "shall assist inmates eligible for community supervision and inmates who are on community supervision to secure employment, educational or vocational training, and housing" requires DOCCS to take adequate measures to support an inmate's acquisition of the three items (employment, education, and housing) that the legislature has determined are most conducive to promoting "inmates' successful and productive reentry into society" (L 2011, ch 62, § 1, part C, § 1, subpart A, § 1).
As the majority acknowledges when it describes DOCCS's duty in terms of "adequate resources" (majority op at 
474), for "assistance" to be "assistance" it must be at least "adequate." Adequate assistance, or "adequate resources," [*12]will differ depending on the needs of each individual. Surely DOCCS need not provide resources regarding SARA-compliant housing for parolees not subject to SARA at all. Likewise, I hope the majority would agree that DOCCS would fail to "assist" a paraplegic inmate if DOCCS gave the inmate a list of potential residences consisting exclusively of fourth-floor walk-ups. DOCCS appears to agree: in its reply to the amicus brief of the Legal Aid Society, DOCCS explains that its assistance to each inmate "depends on dynamic and individualized variables" that, presumably, yield different levels of "assistance" for each inmate depending on inmate needs.[FN7] In all cases the duty on DOCCS is the same—it simply must apply the same duty to the individualized circumstance of each inmate.
The majority fears that the Appellate Division's "substantial assistance" phrasing (which, to me, simply means "adequate assistance") would impose an "unreasonable and impracticable" requirement on DOCCS to "secure each inmate [eligible for community supervision] housing, educational or vocational{**32 NY3d at 482} training, and employment" (majority op at 
472 [emphasis added]). That is not what the Appellate Division said. Instead, it simply recognized that because "assistance" worthy of the term will vary depending on the inmate, a set of inmates with readily-known legal disabilities (sex offenders subject to SARA) require more (and more specialized) housing assistance from DOCCS than others, and those returning to New York City will require different (perhaps more, perhaps less) assistance than those returning to a rural area. The legislature also did not instruct DOCCS to "secure" housing for inmates nearing release—it expressly instructed DOCCS to "assist inmates . . . to secure" housing. Had the legislature wanted DOCCS to secure housing for inmates upon release, it easily could have said so. "Assist" means less than "secure," but more than nothing. Indeed, individualized assistance is the most sensible implementation of a duty to "assist" because giving those who require less assistance than average only the assistance they require frees up resources for more needy inmates. Leona Helmsley did not need housing (or vocational or educational) assistance upon her release from prison. Mr. Gonzalez did. The fact that the statutory duty as to both is the same does not mean that identical efforts will meet that duty.
It is neither "unreasonable" nor "impracticable" to conclude that DOCCS must make an individualized determination as to whether an inmate nearing release needs certain types of assistance to be able to "secure . . . housing," and then to take adequate steps to provide that assistance. Although the majority complains that anything other than "assistance in a general manner" to "all inmates" would "alleviate the ultimate obligation on the inmate to locate housing" (majority op at 
473), that is precisely what "assistance" is supposed to do: alleviate ("to make [something, such as suffering] more bearable")[FN8] the burdens on the inmate's search for housing imposed by that inmate's individual circumstances—in Mr. Gonzalez's case, the burden imposed on him by DOCCS's interpretation of SARA. Adequate assistance requires DOCCS to address proactively the particular needs of an inmate as to the three items on the legislature's list, without eliminating the obligation of inmates to make their own efforts as well.
However, as the Appellate Division found, DOCCS failed to "assist" Mr. Gonzalez even in the narrowest sense of the term.{**32 NY3d at 483} The Appellate Division's factual findings, largely uncontroverted by DOCCS (and unreviewable by us even were they controverted), are worth quoting at length (Matter of Gonzalez v Annucci, 149 AD3d 256, 262-264 [3d Dept 2017] [emphasis added]):
"[V]irtually the only 'assistance' offered to petitioner involved waiting for him—then confined in an RTF located within the walls of a medium security prison, without access to the Internet, without the ability to leave the facility to visit libraries, housing [*13]offices or potential residences, and with strictly limited access to telephone and correspondence privileges—to identify potential residences and to then investigate his proposals . . . [F]rom the submissions of both parties, it clearly appears that [the meetings DOCCS arranged with counselors or others] were geared primarily to the investigation and approval of residences that petitioner had somehow managed to identify. These meetings failed to include any affirmative assistance in locating such housing in the first place, such as the provision of information about potential residence opportunities, SARA-compliant areas or neighborhoods, referrals to community agencies or opportunities beyond those offered to regular inmates to use a telephone, computer or other resources to research residence opportunities . . . .
"DOCCS officials did little or nothing to assist petitioner, and . . . his efforts were entirely fruitless as the officials disapproved each and every one of the 58 potential residences that petitioner had found. . . . There is nothing in the record to indicate that officials provided petitioner with any manner of aid, such as other suggestions, referrals, information or any other form of affirmative assistance until his name eventually came up on the waiting list for placement in the SARA-compliant homeless shelter to which he was ultimately transferred."
As the record in this case vividly demonstrates, the principal assistance DOCCS provided to Mr. Gonzalez was allowing him periodically to submit a list of guesses to a parole officer whose function was to enter those guesses into a computer and report{**32 NY3d at 484} back that Mr. Gonzalez had failed yet again. DOCCS did not give him access to its system to allow him to search for himself; it did not provide him a map, a list of potential neighborhoods, or even a hint as to how to look for available compliant housing. DOCCS stated at oral argument that it will not provide a map showing SARA-compliant geographic locations within New York City because the "situation [is] in flux." Putting aside the infrequency with which schools move, DOCCS's response is unsatisfactory: DOCCS could have provided an updated map at each meeting, with a caveat as to the dynamism of the situation. DOCCS also acted arbitrarily when it categorically rejected homeless shelters when Mr. Gonzalez proposed them at the start of his incarceration at the RTF, but suddenly placed him in one four months later.[FN9] DOCCS was likewise unable to explain why its own Directive No. 9222, which authorizes emergency funds for housing in New York City, was unavailable to assist Mr. Gonzalez, instead simply waving the directive away as part of its "comprehensive housing assistance policies"; an Orwellian term for policies designed to restrict the housing Mr. Gonzalez can access. Indeed, DOCCS actively hindered others from assisting Mr. Gonzalez when it refused to allow Mr. Gonzalez's own mother to propose potential addresses to DOCCS counsellors, instead insisting she deliver the addresses to Mr. Gonzalez, who then had to wait until his next biweekly meeting with the DOCCS officer to ask that those locations be evaluated.
Far from providing "adequate resources," the majority's own standard for assistance (majority op at 
474), DOCCS provided Gonzalez with nothing. DOCCS itself admits it did nothing whatsoever to assist Mr. Gonzalez to secure housing while Mr. Gonzalez was serving his determinate sentence, even though the duty to "assist" is imposed on DOCCS by statute on the first day of Mr. Gonzalez's sentence.[FN10] As the Appellate Division put it: "[i]f such [*14]efforts, without more, are all that is required,{**32 NY3d at 485} then the additional affirmative statutory obligation to assist offenders in the process of finding housing . . . is without meaning" (149 AD3d at 263).
It is irrelevant that, in a different statutory scheme (Correction Law § 203 and its cousins) the majority and I agree is not applicable to level one offenders like Mr. Gonzalez, "DOCCS is given a law enforcement task of investigation" and does not "place[ ] a sex offender in any housing" (majority op at 
473-474). As its own name indicates, the Department of Corrections and Community Supervision was expressly created by the legislature to do multiple things—imprison and rehabilitate, restrict inmates' freedom and prepare them to exercise it again, and provide "a seamless network for the care, custody, treatment and supervision of a person" (L 2011, ch 62, § 1, part C, § 1, subpart A, § 1). The majority's relegation of DOCCS to "law enforcement" buries DOCCS's rehabilitative mission—to help inmates to find the essential attributes of a socially beneficial life (a job, a home, and education).
The picture that emerges in this case, even from the majority's sketching, is one in which DOCCS is mired in some complex interagency and interjurisdictional politics over sex-offender housing. That might be a satisfactory answer to DOCCS and the various jurisdictions and agencies with which it interacts but is of no consequence to the legislature's command that DOCCS assist Mr. Gonzalez and is not even cold comfort for Mr. Gonzalez. The legislature emphasized the rehabilitative purpose of Correction Law § 201; we should not now deny it.
[*15]III.
Although I agree with the Appellate Division's holding as to DOCCS's failure to provide adequate housing assistance to Mr. Gonzalez, I believe it, and the trial court, erred in not permitting discovery and proper fact-finding to determine whether{**32 NY3d at 486} Mr. Gonzalez's placement in the Woodbourne RTF was contrary to law.[FN11]
Whether Mr. Gonzalez's placement in the Woodbourne RTF pursuant to Penal Law § 70.45 (3) was lawful depends, in part, on whether the Woodbourne RTF complied with the requirements of RTFs when Mr. Gonzalez was there. The RTF to which DOCCS assigns a prisoner must be "a community based residence in or near a community where employment, educational and training opportunities are readily available for persons who are on parole or conditional release and for persons who are or who will soon be eligible for release on parole who intend to reside in or near that community when released" (Correction Law § 2 [6]), and must provide "appropriate education, on-the-job training and employment" as well as "[p]rograms directed toward the rehabilitation and total reintegration into the community" for inmates transferred there (Correction Law § 73 [2], [3]) and permit residents "to go outside the facility during reasonable and necessary hours to engage in any activity reasonably related to his or her rehabilitation and in accordance with the program established for him or her" (id. § 73 [1]).
The parties dispute whether Woodbourne RTF did, in fact, comply with those requirements when Mr. Gonzalez was sent there.[FN12] Mr. Gonzalez alleges he was never allowed to leave; DOCCS replies that he never asked to leave. Mr. Gonzalez claims the work program on which DOCCS assigned him in the Woodbourne RTF was in fact the same program that inmates had access to; DOCCS disputes this and argues Mr. Gonzalez got a better deal than inmates. DOCCS claims Mr.{**32 NY3d at 487} Gonzalez had access to a special RTF therapeutic program; Mr. Gonzalez claims this program was identical to prison programming. These are material facts—if Mr. Gonzalez is right, Woodbourne RTF was in every way identical to a prison (except, perhaps, for more opportunity to see one's parole officer); if DOCCS was right, Woodbourne RTF was truly a transitional treatment program. These facts are eminently triable. Indeed, similar claims are being tried with respect to the Fishkill RTF right now (see Alcantara v Annucci, 55 Misc 3d [*16]1216[A], 2017 NY Slip Op 50610[U] [Sup Ct, Albany County 2017]). CPLR 7804 (h) requires a trial on disputed questions of material fact (see e.g. Matter of Kickertz v New York Univ., 25 NY3d 942, 944 [2015]) and that is what should have happened here—not, as occurred below, a terse affirmance based on "limited record evidence" (Matter of Gonzalez v Annucci, 149 AD3d 256, 262 [3d Dept 2017]) that the majority, equally as tersely, approves today. Indeed, the majority's conclusion that "the record demonstrates that petitioner was accorded the rights of a resident of an RTF, as opposed to an inmate" (majority op at 
475) sounds like a conclusion by a trier of fact—except that the facts have not been developed and this Court does not try facts (NY Const, art VI, § 3 [a]). I would therefore reverse and remand for the development of a record on this claim.
IV.
The most striking feature of DOCCS's actions in this case is not simply that they were unlawful, but that they were unmoored to the legislature's expressed penological policy. This is most vividly on display when we come to consider Mr. Gonzalez's entitlement to the good-time credit he earned.
I agree with the majority that the good-time credit issue is moot (majority op at 
471 n 3), but conclude that it falls into the mootness exception. Mr. Gonzalez makes two claims: first, that had he not been stripped of his earned good-time credit, he would have been moved to the RTF four months early, starting the six-month RTF clock substantially earlier; second, that his PRS was lengthened unduly (by the amount of his wrongfully deprived good-time credit). I agree with the majority that offenders with longer periods of PRS could bring the second claim, so that it is not likely to evade review, and does not fall within the mootness exception. Mr. Gonzalez's first, RTF-placement-timing claim does fall within the exception, however: it is capable of repetition but will evade our review.{**32 NY3d at 488}
The majority posits a long-sentence offender whose claim would avoid mootness. The lengthiest term of imprisonment for felony sex offenders likely to see release in their lifetimes is a determinate sentence of 25 years (Penal Law § 70.80 [4] [a] [i]). Good behavior allowances are capped at one seventh of the sentence proper for determinate sentences (Correction Law § 803 [1] [c]), which is about 3.6 years for a 25-year sentence. It took almost exactly four years for Mr. Gonzalez's case to reach us. Thus, even for an offender with a very lengthy determinate sentence who earned the maximum allowable credit, the case would be moot by the time it arrived here. Accordingly, Mr. Gonzalez's first claim (above) is likely to recur but will evade review and is thus subject to the mootness exception (City of New York v Maul, 14 NY3d 499 [2010]).
Good-time credits are provided to inmates to encourage them to comply with prison rules and work towards rehabilitation while imprisoned (Matter of Amato v Ward, 41 NY2d 469, 475 [1977] ["(i)t is a penological commonplace that it is necessary to provide positive incentives for good behavior in prison"]). DOCCS stripped Mr. Gonzalez of that credit solely because, while he was still in prison, before his transfer to an RTF, he could not locate SARA-compliant housing on his own. DOCCS concedes, and the record shows, it provided no housing assistance whatsoever to Mr. Gonzalez during that time; DOCCS's efforts, as it describes them, came later.
The deprivation was not conducted "in accordance with law" (Correction Law § 803 [4]). The legislature permits credits to be "withheld, forfeited or canceled in whole or in part for bad behavior, violation of institutional rules or failure to perform properly in the duties or program assigned" (Correction Law § 803 [1] [a]). Nowhere in the statute is DOCCS permitted to revoke good-time credit because all the RTF spaces it has budgeted for are filled at the time an inmate's conditional release date rolls around, or because inmates are unable to find SARA-compliant housing in a location the majority acknowledges is extraordinarily constrained. DOCCS can point to no failure to "perform properly in the duties or program assigned" except, perhaps, Mr. Gonzalez's inability to provide DOCCS with a potential address when there was no hope that any address he proposed within the five boroughs would be approved. It cannot be lawful to condition good behavior credit on the fulfilment of an impossible condition, which is what DOCCS did here. Mr. Gonzalez earned his credit and did nothing to{**32 NY3d at 489} merit its revocation; "every prisoner who earns the credit is entitled to benefit from it" (People ex rel. Ryan v Cheverko, 22 NY3d 132, 138 [2013] [emphasis omitted]).
Even if that deprivation was not ultra vires, it was arbitrary and capricious and accordingly violated due process. Although DOCCS has discretion in revoking good-time credits when an inmate's behavior warrants it, arbitrary or capricious revocation violates an inmate's due process rights (Matter of Laureano v Kuhlmann, 75 NY2d 141, 146[*17][1990]). Here, DOCCS's revocation was either based on Mr. Gonzalez's failure to fulfil an impossible condition or on factors entirely outside Mr. Gonzalez's control. This is the essence of arbitrary conduct.
Instead, had DOCCS released Mr. Gonzalez to any homeless shelter in New York City, the City would have been required to find him a bed, because the City guarantees (and indeed must guarantee) housing for every homeless person who requests it (see Callahan v Carey, 307 AD2d 150, 151 [1st Dept 2003] [describing the August 1981 consent decree requiring New York City to provide temporary shelter to homeless individuals]; cf. 18 NYCRR 352.36 [a] [4] [iii] [obliging local governments to provide temporary housing assistance for sex offenders]) and when, after all, DOCCS belatedly elected to discharge Mr. Gonzalez to such a shelter anyway.[FN13] According to DOCCS, it revoked Mr. Gonzalez's good-time credit and later placed him in the Woodbourne Correctional Facility because DOCCS and New York City have an agreement that restricts the flow of sex offenders to be released to homeless shelters. The existence of that agreement provides no basis to strip Mr. Gonzalez of his good-time credit. Likewise, it would not have harmed DOCCS to have transferred Mr. Gonzalez to the Woodbourne RTF in May, granting him his good-time credit. Doing so would have allowed the credit to shorten his term of PRS as well, with the result that he could leave the SARA-compliant homeless shelter four months earlier. Indeed, DOCCS now says, effectively, that it will revoke good-time credits for sex offenders planning to{**32 NY3d at 490} return to New York City—which, of course, will reduce the incentive of such sex offenders to earn them and/or to return to the place where they have a support network, further impeding DOCCS's rehabilitative mission.
What DOCCS has done to Mr. Gonzalez is neither statutorily authorized nor penologically justified. It should not stand. I accordingly dissent.
Judges Stein, Fahey, Garcia and Feinman concur; Judge Rivera concurs in part and dissents in part for the reasons stated in sections I through III of Judge Wilson's dissenting opinion; Judge Wilson dissents in an opinion.
Order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.

Footnotes

Footnote 1:A residential treatment facility is defined as
"[a] correctional facility consisting of a community based residence in or near a community where employment, educational and training opportunities are readily available for persons who are on parole or conditional release and for persons who are or who will soon be eligible for release on parole who intend to reside in or near that community when released" (Correction Law § 2 [6]).
Footnote 2:Petitioner also sought his immediate release from custody but dropped that claim after he was released to SARA-compliant housing.

Footnote 3:The issue of the loss of petitioner's good time credit was not moot at the time the Appellate Division rendered its decision—when petitioner was still serving PRS and any error in the calculation of time required for his supervision could be corrected. However, the issue became moot when petitioner completed his PRS term in September 2017. This claim does not fall within the exception to mootness because it is unlikely to evade review, given that other sex offenders subject to the same SARA residency requirement—particularly those subject to a lengthy term of PRS (see Penal Law § 70.45 [2-a] [containing range of 3 to 25 years of PRS for felony sex offenses])—can raise the challenge to the loss of good time credit while they remain on PRS.

Footnote 4:We note that petitioner, who represents he is indigent, has not included either the local DSS or the Office of Temporary and Disability Assistance in this proceeding. In light of the petitioner's limited selection of parties, the dissent's claim that a released sex offender could be dropped off at "any homeless shelter" in New York City because a 1981 consent decree provides housing for every homeless person (see dissenting op at 
489) is not an issue that can be reached on this appeal (compare Alcantara v Annucci, 55 Misc 3d 1216[A], 2017 NY Slip Op 50610[U] [Sup Ct, Albany County 2017] [including the New York City Department of Social Services and New York City Human Resources Administration as defendants]).

Footnote 5:The dissent posits that, because petitioner is a level one sex offender, he could live with his parents in non-SARA-compliant housing or be released to any homeless shelter in New York City (see dissenting op at 
478 and n 3, 489). The SARA-residency requirement, which is imposed based on either an offender's conviction of a specifically enumerated offense against an underage victim or the offender's status as a level three sex offender (Penal Law § 65.10 [4-a]), is a mandatory condition of petitioner's PRS (Penal Law § 70.45 [3]). The legislature was clearly concerned with the release of the sex offender back into a community and accordingly imposed a duty on the parole officer to actually supervise the parolee, which requires knowledge of the parolee's residence and that same is not in violation of the conditions of release. The dissent's suggestions of how to remediate the "impossible" problem generated by the SARA housing restrictions generally ignore the point of SARA-compliant housing—to wit, keeping sex offenders such as petitioner, convicted of sexually assaulting a minor, 1,000 feet from children in school areas.

Footnote 6:We note that similar claims relating to Fishkill Correctional Facility as an RTF are pending in discovery proceedings before Albany County Supreme Court (see Alcantara v Annucci, 55 Misc 3d 1216[A], 2017 NY Slip Op 50610[U] [Sup Ct, Albany County 2017]).

Footnote 1:See e.g. Franz Kafka, The Trial 50-57 (Mike Mitchell translator, Oxford World's Classics 2009).

Footnote 2:SORA requires all persons convicted of various sex crimes to be classified, in a judicial proceeding, as being a level one, two, or three sex offender (where one is the least serious ranking). For example, in general level one offenders must register annually with the State for 20 years, while level two and three offenders must register once a year for life (Correction Law § 168-h). Level three offenders must also personally verify their residences every 90 days with local law enforcement (id.).

Footnote 3:Indeed, I note that, even if Mr. Gonzalez's parents' home was within 1,000 feet of a school, the home was not an "area accessible to the public," and therefore his presence in his parents' home would not have violated SARA. Although this functionally would amount to house arrest for the period of his PRS, he may well have preferred that to functional house arrest in the homeless shelter into which he was ultimately placed.

Footnote 4:"Substantial" means "consisting of or relating to substance"; "not imaginary or illusory" (see Merriam-Webster Online Dictionary, substantial https://www.merriam-webster.com/dictionary/substantial). It may also mean "important" or "essential," but the question here is not which of these meanings the Appellate Division had in mind when using the word, but whether what DOCCS did is what the legislature directed it to do.

Footnote 5:I agree with the majority that we do not defer to DOCCS to define "assist" (majority op at 
471), because it is a "matter of pure legal interpretation" rather than a concept for which agency expertise would be relevant (cf. Matter of Teachers Ins. & Annuity Assn. of Am. v City of New York, 82 NY2d 35, 42 [1993]).

Footnote 6:Indeed, at least as a general matter, DOCCS understands the legislature's rehabilitative goals. DOCCS describes its own mission as "[e]nhanc[ing] public safety by having incarcerated persons return home under supportive supervision less likely to revert to criminal behavior," and "improv[ing] public safety by providing a continuity of appropriate treatment services in safe and secure facilities where all inmates' needs are addressed and they are prepared for release, followed by supportive services for all parolees under community supervision to facilitate a successful completion of their sentence" (New York State Department of Corrections and Community Supervision, The Departmental Mission, http://www.doccs.ny.gov/mission.html).

Footnote 7:DOCCS makes this point while arguing that the mootness exception does not apply to this case because each inmate's situation is different. That argument might well have had force had DOCCS not also revealed, in the course of this litigation (and indeed in its very briefing to this Court), that it was not considering level one offenders in any individualized way in the course of providing housing assistance, but simply subjecting them to the precisely the same housing policy they would apply to the most dangerous level three offender.

Footnote 8:Merriam-Webster Online Dictionary, alleviate, https://www.merriam-webster.com/dictionary/alleviate.

Footnote 9:I note that the Legal Aid Society, in an amicus brief to this Court, provides fuller information on DOCCS's policies and practices that, while not part of the record in this case, nonetheless support the Appellate Division's findings: the nonprofit providers on DOCCS's list of "Re-Entry Resources" do not provide SARA-compliant housing and DOCCS simply calls landlords, asks if housing is available, and writes down the inevitable "no" they get without further investigation or dialogue.

Footnote 10:The duty to assist under Correction Law § 201 encompasses housing, educational and vocational training, and employment. That duty is triggered when an inmate becomes "eligible" for community supervision. In accordance with our decision in People v Sparber (10 NY3d 457 [2008]), postrelease supervision is an integral part of a determinate sentence (see also Penal Law § 70.45). DOCCS's duty under section 201, therefore, attaches at the time of sentencing, although, again, different duties and different inmates will require different and differently-timed efforts on DOCCS's part. For example, an inmate serving a 10-year determinate sentence will not need housing assistance until release approaches but may need vocational training or education to commence near the start of incarceration.

Footnote 11:I agree with the majority that Mr. Gonzalez's challenge is not to whether Woodbourne complied with RTF rules when it was designated an RTF in 1984 (cf. 7 NYCRR 100.50 [c] [2]) but rather whether Woodbourne RTF complied with statutes and regulations pertaining to RTFs set out in Correction Law §§ 2 (6) and 73 when it housed Mr. Gonzalez. If a court found that as a matter of law Woodbourne RTF did not presently meet the statutory criteria for being an RTF, DOCCS would be without power to confine Mr. Gonzalez there during his PRS period (no matter what it provided to the contrary in 7 NYCRR 100.50 [c] [2]). Once Mr. Gonzalez's challenge is so understood, I believe this Court to be unanimous that there is no obstacle to our consideration of the merits of that claim.

Footnote 12:As a necessary step in its mootness analysis, the majority holds (majority op at 
470-471) that Penal Law § 70.45 (3) allows DOCCS to place an inmate serving PRS after a definite sentence in an RTF for a maximum of six months, "notwithstanding any other provision of law" (cf. McKinney's Cons Laws of NY, Book 1, Statutes §§ 223, 238). I agree with the majority that, as a result, Mr. Gonzalez's RTF placement claim is subject to the mootness exception.

Footnote 13:The majority answers that Mr. Gonzalez cannot raise this claim in this litigation, having not sued the City (unlike the plaintiffs in Alcantara v Annucci [55 Misc 3d [*18]1216(A), 2017 NY Slip Op 50610(U) (Sup Ct, Albany County 2017)], who unsuccessfully sued the City under somewhat different circumstances). Indeed so. But Mr. Gonzalez can, and has, raised the claim that DOCCS's policy of stripping him of his good behavior credit based on the behavior of other governmental actors is unlawful, and that DOCCS has adopted a policy of refusing to accept homeless shelters until suddenly it does, represents just such a hindrance.